**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re:<br><br>K.T. Spears Creek, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 11-04241-jw |

# DISCLOSURE STATEMENT

Filed by the Debtor-in-Possession

On September 5, 2011

Table of Contents

**I.  INTRODUCTION** ...................................................................................................................1

**II.  HISTORY OF THE DEBTOR AND EVENTS LEADING TO THE FILING OF BANKRUPTCY**....2

**III.  POST-PETITION ACTIVITY**................................................................................................4

BANKRUPTCY FILING AND FIRST DAY MOTIONS..............................................................4

*Rule to Show Cause*................................................................................................4

*Motion to Substitute Counsel*..................................................................................4

**IV.  PROPERTY OF THE DEBTOR** ............................................................................................6

**V.  SUMMARY OF PROPOSED PLAN** ........................................................................................6

PLAN FRAMEWORK AND SUMMARY..................................................................................7

**VI.  CLASSIFICATION OF CREDITORS** ...................................................................................9

Class 1    Secured Claim of RBC. Secured, Impaired. ...........***Error! Bookmark not defined.***

Class 2    Secured Claim of Plantation Federal. Secured, Impaired. .***Error! Bookmark not defined.***

Class 3    Secured Claim of First Palmetto  Secured, Impaired...........***Error! Bookmark not defined.***

Class 4    *Administrative Claims. Unimpaired.* .................................................................*11*

Class 5    *Priority Claims. Priority, Unimpaired* ................................................................*12*

*Class 6    General Unsecured Creditors.  Unsecured Non-priority, Impaired.* ....................12

*Class 7    Equity.    Equity Interest non-priority, Impaired.* ...................................................12

**VII.  FEASIBILITY OF PLAN** ..........................................................................................................13

**VIII.  RISKS ASSOCIATED WITH THE PLAN** ......................................................................13

**IX.     CERTAIN TAX CONSEQUENCES** ................................................................................14

**X.     LIQUIDATION AND OTHER ALTERNATIVES TO PLAN CONFIRMATION** ...........................15

    <u>ALTERNATIVES.</u> ................................................................................................................15

    <u>DISMISSAL.</u> .........................................................................................................................15

    <u>CONFIRMATION OF AN ALTERNATIVE PLAN.</u> ................................................................15

    <u>CHAPTER 7 LIQUIDATION.</u> .................................................................................................16

# DISCLOSURE STATEMENT

## I. INTRODUCTION

K.T. Spears Creek, LLC, (the "Debtor") provides this Disclosure Statement to all of its known creditors in order to disclose information considered by the Debtor to be important, material and necessary for the creditors to make a reasonably informed decision in exercising their right to vote on the Plan of Reorganization of the Debtor (the "Plan") which has been summarized herein. The Plan was filed with the Bankruptcy Court along with this Disclosure Statement. All defined terms shall have the meanings ascribed in the Plan unless otherwise defined herein.

This Disclosure Statement must provide such information, as far as practicable, that would enable a hypothetical reasonable investor typical of the holders of claims to make an informed judgment about the Plan. The Debtor asserts and believes that the information provided in this Disclosure Statement gives information which is adequate for an investor to make such a decision. The United States Bankruptcy Court will set a hearing to determine if this Disclosure Statement provides adequate information and conforms to the requirements of the Bankruptcy Code (11 U.S.C. §101 et seq.). Accompanying this Disclosure Statement is the Plan.

The United States Bankruptcy Court will set a date for a hearing on the acceptance of the Plan or may combine the Disclosure Statement and Plan hearing. Notice of the Plan hearing will be mailed to all holders of claims along with this Disclosure Statement. Attached to the Disclosure Statement is a copy of the ballot for voting on the Plan as set forth therein.

Each Potential Claimant, creditor, equity holder and party-in-interest should review this Disclosure Statement carefully, including any and all exhibits, in their entirety and then determine whether to accept or reject the Plan based upon independent judgment and evaluation. The description of the Plan in this Disclosure Statement is in summary form and is qualified by reference to the actual terms and conditions of the Plan, which Plan should be reviewed carefully in its entirety.

The vote of all creditors and holders of claims is very important. The Court will confirm the Plan if it is accepted by the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the creditors or holders of claims in each class voting on the Plan, and two-thirds (2/3) in number of the holders of allowed interests voting on the Plan. In the event the requisite number of acceptances is not obtained, the Court may still confirm the Plan if the Court finds the Plan accords fair and equitable treatment to those classes rejecting the Plan. This provision is set forth in Section 1129(b) of the Bankruptcy Code and requires that, among other things, claimants must either receive the full value of their claims or, if they receive less, no Class with a junior priority may receive anything.

1

The Plan represents a legally binding arrangement and should be read in its entirety, rather than relying on the summary in this Disclosure Statement. Approval of the Disclosure Statement by the United States Bankruptcy Court does not constitute approval by the Bankruptcy Court on the merits of the Plan.

EXCEPT WHERE SPECIFICALLY STATED OTHERWISE, THE DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTOR AND HAS BEEN PREPARED BASED ON INFORMATION AVAILABLE TO THE DEBTOR. NO REPRESENTATIONS CONCERNING THE DEBTOR (PARTICULARLY THE VALUE OF THE ASSETS OF THE DEBTOR) ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. THOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY.

NO PERSON SHALL CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH PERSON SHOULD CONSULT WITH THEIR OWN LEGAL, BUSINESS, FINANCIAL, OR TAX ADVISOR AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION AND THE PLAN.

## II. HISTORY OF THE DEBTOR AND EVENTS LEADING TO THE FILING OF BANKRUPTCY

The Debtor is a South Carolina limited liability company that owns three parcels of property on which it plans to develop. The Debtor has already developed Phase 1 of a planned two-phase apartment community. The other two parcels of property are in the planning/marketing stages of development. The Debtor's primary office is located at 2855 Mangum, Suite 555, Houston, TX.

The Debtor was formed in 2004 by Kyle Tauch ("Mr. Tauch") to purchase the property and to create a planned development. Mr. Tauch initially developed only the first phase of the apartment community, prior to the housing crisis. The initial development was the most costly part of the development, as it required the construction of not only the housing units, but also the infrastructure that is a prerequisite for the upper end apartment communities. Phase two would not have the same development costs, as it would only require the building of the housing units. Unfortunately the housing crisis closed access to the credit that the Debtor required to develop phase 2 of the apartment community, effectively reducing the Debtor's income by half.

The funding for Phase 1 of the development was provided by RBC Bank on May 25, 2006 in the amount of 19,700,000.00. As collateral for the note, the Debtor provided RBC Bank a mortgage, security in the Debtor's personalty, and security in the rents received from the apartments in Phase 1. RBC Bank asserted that the Debtor failed to pay the note at maturity, and prepetition, RBC Bank filed a foreclosure lawsuit against the Debtor and others in the Court of Common Pleas for Richland

County, South Carolina (the "Court of Common Pleas"), Case No. 2010-CP-40-6025 (the "Foreclosure"), which Foreclosure sought to appoint a receiver, foreclose RBC Bank's mortgage and security interests, and obtain a deficiency judgment. On November 12, 2010, the Court of Common Pleas entered an order appointing Henry W. Moore of Colliers International as receiver (the "Receiver") over the Greenhill Parish Apartments. The Receiver remained in place at filing of this bankruptcy case and remained in control of the Debtor's property and books and records until removed by consent order entered by this Court on July 29, 2011. Prepetition, on or about February 18, 2011, the Court of Common Pleas entered a Master's Order and Judgment of Foreclosure and Sale (the "Foreclosure Order"). Pursuant to RBC's Motion, as of the Petition Date, the total outstanding amount owed to RBC Bank is alleged to be $22,494,711.88.[1] RBC Bank alleges that they are also entitled to per diem interest of $9,507.72, pursuant to an 18% default rate.

The Debtor also plans on developing two additional parcels of land as part of a mixed-use development that will provide essential services and shopping venues for residents of the Apartment Complex. The parcels are planned to have shopping and townhomes for the upwardly mobile apartment residents in phase 1 and eventually phase 2. This part of the development project was hindered due to the housing crisis.

The first parcel, approximately 66 acres, is encumbered by a mortgage executed by First Savers Bank. The Debtor and First Savers Bank executed a commercial promissory note (the "Savers Note") in the original principal amount of $6,000,000.00, with interest to accrue at the initial rate of 7% per annum. Also on or about December 21, 2007, the Debtor executed a Mortgage (the "Mortgage") on approximately 66 acres of land. The Savers Note was later renewed after First Savers became a division of Plantation Federal Bank. Such renewal required a principal reduction that changed the principal amount to $5,950,000.00. Prepetition, Plantation Federal filed a foreclosure lawsuit against the Debtor and others in the Court of Common Pleas for Richland County, South Carolina (the "Court of Common Pleas"), Case No. 2010-CP-40-6221 (the "Foreclosure"), which Foreclosure sought to foreclose Movant's mortgage and security interests, and obtained a deficiency judgment. Pursuant to Motion, as of the Petition Date, the total outstanding amount owed to Movants is alleged to be $6,753,339.07.

---

[1] The Foreclosure Order establishes that the total amount owed to RBC Bank is $22,646,397.88, which includes $125,000 in attorneys' fees relating to the foreclosure and $2,500,220.16 of interest (calculated at the default interest rate of 18%).

3

The Second Parcel, which is approximately 7 acres, is encumbered by a first priority mortgage in favor of First Palmetto Savings Bank, FSP ("First Palmetto"). On or about March, 16, 2009 the Debtor and First Palmetto executed a commercial promissory note (the "Palmetto Note") in the original principal amount of $935,719.46, with interest to accrue at the initial rate of 6% per annum. Also on or about March 16, 2009, the Debtor executed a Mortgage (the "Mortgage") to approximately 7.6 acres of land as described in the mortgage. Monthly interest payments were consistently made through March 2011. Payments to all creditors ceased once it was clear that RBC would foreclose its mortgage and the prospect of bankruptcy was inevitable.

The Greenhill Parish Apartments (RBC collateral) have remained at a very favorable occupancy for the past 18 months. Occupancy is currently 96%. The commercial tracts (Plantation Federal and First Palmetto) are well located and one of the only parcels in the market of adequate size to accommodate the critical mass of a mixed-use development.

On May 3, 2011, K.T. Spears Creek, LLC, filed for chapter 11 protection under the United States Bankruptcy Code.

## III. POST-PETITION ACTIVITY
### Bankruptcy Filing and First Day Motions

The Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on May 3, 2011, in the Southern District of Texas (Case No. 11-33991-H3-11). After a motion and hearing, the case was ordered to be transferred to the District of South Carolina on June 26, 2011. Since that time, the Debtor has managed its assets as a debtor-in-possession pursuant to §§1107(a) and 1108 of the Bankruptcy Code and upon information and belief has remained current on all of its post-petition obligations.

Rule to Show Cause

On July 11, 2011, the Bankruptcy Court for the District of South Carolina issued a Rule to Show Cause ("Rule to Show") under Local Bankruptcy Rule 9011-2(c) to determine why the Debtor was appearing in the district without counsel. Such Rule to Show was set for a hearing on or before July 21, 2011. At the hearing on July 21, 2011 the Rule to Show was dissolved as it was mooted when the Debtor filed its motion to substitute and its Motion to Employ the McCarthy Law Firm, LLC.

Motion to Substitute Counsel

On July 18, 2011, the Debtor filed its Motion to Substitute Counsel Okin Adams & Kilmer, LLP with the McCarthy Law Firm, LLC. Such motion was granted on July 19th, 2011.

<u>Motion for an Order Granting Final Authority for Debtor's use of Cash Collateral</u>

On August 18, 2011, the Debtor filed its motion requesting final authority to use Cash Collateral and provided for replacement liens to RBC ("Cash Collateral Motion"), who has a security interest in those liens.  The Cash Collateral Motion is set for a hearing on September 6, 2011, which will take place after the filing of this document, but before a hearing on the disclosure statement can take place.

<u>Debtor's Application to Employ Professional Realty, Inc.</u>

On August 12, 2011, the Debtor filed its Application to Appoint Professional Realty, Inc as its Real Estate professional.  Such motion is set for a hearing on September 6, 2011.

**Creditor Actions**

<u>RBC Bank's Motion to Dismiss the Debtor's Bankruptcy Case</u>

On July 28, 2011, RBC Bank filed a motion to dismiss for bad faith filing on the part of the Debtor.  On August 29, 2011, the Debtor filed its objection to the relief sought by RBC Bank, asserting amongst other things, that RBC has failed to carry its burden, that the Debtor filed its bankruptcy in good faith, and that dismissal is not warranted.  A hearing on this matter is set for September 6, 2011, which will take place after the filing of the Disclosure Statement, but before a hearing on the Disclosure Statement can take place.

<u>RBC Bank's Objection to the use of Cash Collateral</u>

On August 30, 2011, RBC Bank objected to the Debtors Cash Collateral Motion arguing that the Debtor is not entitled to use Cash Collateral as the Debtor does not own the cash proceeds from the Debtor's rents.  This objection will be heard on September 6, 2011

<u>RBC Bank's Objection to the Employment of Professional Realty, Inc.</u>

On August 31, 2011, RBC Bank objected to the Debtors Application to Employ Professional Realty Inc. by adopting the arguments of the United States Trustee.

<u>First Savers/ Plantation Federal's Motion for Relief from the Automatic Stay</u>

On August 10, 2011, Plantation Federal filed its Motion for Relief From the Automatic Stay ("Savers Stay Motion"), alleging that the Debtor could not reorganize, lacked equity in the property, and that sufficient grounds for relief from the automatic stay exist.  On August 24, 2011, the Debtor filed a response to the motion alleging that equity was present in the property, that Plantation Federal has not carried its burden in showing cause exists, and that relief from the stay should not be granted

5

because the property was essential to the Debtor's reorganization.

First Palmetto's Motion to Dismiss

On August 12, 2011, First Palmetto filed a motion to dismiss for bad faith filing on the part of the Debtor. On August 29, 2011, the Debtor filed its objection to the relief sought by RBC Bank, asserting amongst other things, that First Palmetto has failed to carry its burden, that the Debtor filed its bankruptcy in good faith, and that dismissal is not warranted. A hearing on this matter is set for September 6, 2011. On August 31, 2011, the Debtor and First Palmetto entered into a consent order which resolved and settled the differences between First Palmetto and the Debtor and called for a withdrawal of First Palmetto's motion to dismiss. The motion to dismiss was withdrawn that same day.

United States Trustee's Objection to the Employment of Professional Realty, Inc.

The U.S. Trustee objected to the application to employ Professional Realty, Inc. arguing that Professional Realty, Inc. is not disinterested due to the relationship its principal has with an affiliate of the Debtor. This objection will be heard on September 6, 2011.

## IV. PROPERTY OF THE DEBTOR

As described in the Disclosure Statement, the Debtor is currently operating as a Debtor-in-Possession. The Debtor is the owner of three parcels of property. One of those parcels has a 240-unit residential apartment complex. As of the date of the Debtor's bankruptcy filing, the apartment complex was 95% occupied. The other two properties are unimproved parcels of land that surround the already developed apartment complex.

## V. SUMMARY OF PROPOSED PLAN

The Debtor is currently operating as a Debtor-in-Possession. The Debtor is the owner of three parcels of property. One of those parcels has a 240-unit residential apartment complex known as the Greenhill Parish Apartment Complex. As of the date of the Debtor's bankruptcy filing, the apartment complex was 95% occupied. The other two properties are unimproved parcels of land that surround the already developed apartment complex. The properties breakdown as follows:

| Property | Acreage | Est. Value |
|---|---|---|
| Greenhill Parish Apartment Complex | 30.43 | Unknown |
| 66 Acre mixed use site | 66 | $11,000,000.00 |
| Two Notch Frontage | 7.36 | $1,800,000.00 |

**Plan Framework and Summary**

The Debtor proposes to reorganize its debts by reducing its total debt, through the sale and development of the two unimproved parcels, and the sale or development of the Greenhill Apartment Complex. The proceeds from the sale of the property will be used to repay the Debtor's creditors. The Debtor is still reviewing the scheduled and filed claims in this case and has yet to file any claims objections. For this reason, and the uncertainty in the amounts the Debtor will realize from the sale of the property, the Debtor cannot determine how much will be available to the Unsecured Class 6 creditors. Below, the Debtor describes in greater detail how it will market and sell the property. The Debtor believes that any payment will not be *de minimis* and through the Debtor's marketing and sales efforts, there will be a greater amount of money available for Class 4, 5, and 6 than through a Chapter 7 liquidation.

GREENHILL PARISH APARTMENT COMPLEX (First Mortgage Holder – RBC)

The Debtor proposes to retain this property for a period of 2 years, during which the Debtor will attempt to market the property and sell it for the benefit of RBC, or alternatively, refinance the loan with another lender. During the marketing period, the Debtor will continue to employ Greystar as its property management company. Greystar will use the funds received from the property rents to cover its costs and expenditures as the property manager. Any funds received in excess of the Greystar operating costs, as disclosed in the Debtor's Cash Collateral Budget (Docket No. 68), will be used, to make interest payments on the RBC debt (a revised Cash Collateral Budget will be presented at the hearing on September 6, 2011). The Debtor is proposing that the outstanding balance due to RBC Bank be restructured and the excess funds be used to make payments related to that balance. The note will accrue interest at 4%. The revised note will pay RBC Bank 4% monthly interest over a two (2) year term and any funds received in excess of the interest will go to pay principal. This monthly payment, as to be shown in the revised Cash Collateral Budget will be $101,781 and will be paid to RBC Bank at the end of each Month. Any funds that are considered to be the Beginning Cash Balance as listed in the Revised Cash Collateral Budget will be turned over to RBC at the end of September. Currently the budget estimates that amount to be $217,214. The Debtor asserts that these payments are commercially reasonable and will adequately protect RBC Bank's interest only during the 2-year period. Such property will be marketed and sold through the efforts of the Debtor's court authorized real-estate professional.

By operation of the Plan, RBC Bank will be granted replacement liens to the same extent RBC Bank's security existed pre-petition. Any sale will be subject to the liens of RBC.

66 ACRES (First Mortgage Holder – Plantation Federal)

The Debtor is in the process of marketing the 66-acre tract for future development. Currently the property is raw land but is located close to several hundred residential apartment dwellings, including the Debtor's 240-unit apartment complex, Greenhill Parish Apartments. The proposed development would place a mixed-use housing, office, and shopping development on the property in close proximity to the above-mentioned developments. The Debtor has discussed this development with Plantation Federal who currently holds the mortgage on the property.

Plantation Federal has agreed to give the Debtor 18 months to market and sell the property, or market and develop the property ("Plantation Settlement"). The terms of the marketing period are set forth in greater detail by separate agreement (the agreement has not been finalized and will be filed as a supplement to the Disclosure Statement) between the Debtor and Plantation Federal. This agreement calls for the Debtor to meet certain milestones to stay in compliance with the Plantation Settlement. The Debtor will have until March 15, 2012 to sell the first $1,000,000.00 of Plantation Federal's collateral or have a ready, willing and able purchaser of property that will net Plantation Federal that amount of money. If the Debtor meets this first milestone, the Debtor will have until September 15, 2012 to sell or have ready and willing buyers of $1,000,000 net from the collateral. If the Debtor meets this second milestone, the Debtor will have an until March 15, 2013 to dispose of all Plantation Federal property or have a ready and willing buyer as defined by the Plantation Settlement. The terms in this Plan will not modify the terms of any agreement but serve only to explain the terms of the separate agreement. The Debtor believes that even after the sale of all of Plantation Federal's collateral, a surplus of funds will be available to pay to the unsecured creditors in Class 6 below, even after paying all Class 4 and 5 creditors. Such property will be marketed and sold with the aid of the Debtor's court authorized real-estate professional.

If the Debtor defaults under the Plantation Settlement the Debtor will have 15 days to cure such a default. No adequate protection payments are necessary as Plantation Federal is adequately protected by the equity in the property. Interest will accrue against the Debtor's equity in the property. The Debtor will pay and keep all property taxes current during the 18-month period. In addition, the Debtor will pay the outstanding property taxes using sources provided by a third party.

By operation of the Plan, Plantation Federal will be granted replacement liens to the same extent Plantation Federal's security existed pre-petition. Any sale will be subject to the liens of Plantation Federal up to the outstanding debt owed to Plantation Federal.

TWO NOTCH ROAD FRONTAGE (First Mortgage holder – First Palmetto)

First Palmetto is the mortgage holder of property that is subject to a condemnation suit by the local county government to convert part of the property into a turn lane to handle increased traffic. Debtor proposes to assist First Palmetto in addressing this condemnation suit so that First Palmetto may achieve a favorable result. Any funds received from the condemnation suit will be paid to First Palmetto, until First Palmetto is paid in full. The Debtor has also agreed to resolve any access issues that may exist as a result of the above mentioned condemnation suit to reasonable satisfaction of First Palmetto.

First Palmetto has agreed to allow the Debtor 10 months to market and sell the property in order to repay the debt and generate funds in excess of the outstanding obligations. In exchange for this time, the Debtor has agreed to make adequate protection payments monthly to First Palmetto in the amount of $5,000. The Debtor has also agreed to give First Palmetto a deed-in-lieu of foreclosure to be held in the event of a default by the debtor, or until the end of the 10-month period. First Palmetto's collateral will be marketed and sold through the Debtor's court authorized real-estate professional. The Debtor will provide First Palmetto with any offers to purchase the collateral and such offers shall be considered in good faith

By operation of the Plan, First Palmetto will be granted replacement liens to the same extent First Palmetto's security existed pre-petition. Any sale will be subject to the liens of First Palmetto up to the outstanding debt owed to First Palmetto.

## VI.  CLASSIFICATION OF CREDITORS

<u>Class 1</u>        <u>Secured Claim of RBC. Secured, Impaired.</u>

RBC asserts a first priority secured claim of $22,494,711.88 on the Debtor's 240 unit apartment complex and the land that is part of that parcel, an assignment of rents from the Debtor, and guarantees by affiliated entities. Through this Plan, any funds received in excess of the Greystar operating costs, as disclosed in the Debtor's Cash Collateral Budget (Docket No. 68), will be used, to make interest payments on the RBC debt (a revised Cash Collateral Budget will be presented at the hearing on September 6, 2011) ("Revised Cash Collateral Budget"). The Debtor is proposing that the outstanding balance due to RBC Bank be restructured and the excess funds be used to make payments related to that balance. The note will accrue interest at 4%. The revised note will pay RBC Bank 4% monthly interest over a two (2) year term and any funds received in excess of the interest will go to pay principal. This monthly payment, as to be shown in the revised Cash Collateral Budget will be $101,781 and will be paid to RBC Bank at the end of each Month. Any funds that are considered to be

9

the Beginning Cash Balance as listed in the Revised Cash Collateral Budget will be turned over to RBC at the end of September. Currently the budget estimates that amount to be $217,214. The Debtor asserts that these payments are commercially reasonable and will adequately protect RBC Bank's interest only during the 2-year period. Such property will be marketed and sold through the efforts of the Debtor's court authorized real-estate professional.

By operation of the Plan, RBC Bank will be granted replacement liens and mortgages to the same extent RBC Bank's security existed pre-petition. Any sale will be subject to the liens of RBC.

The Debtor believes that RBC bank is fully secured, but because there does not appear to be a substantial equity cushion, it is possible that the sale of the RBC Bank's collateral will not fully repay RBC bank. To the extent RBC Bank is not fully repaid, any deficiency shall be treated as a Class 6 General Unsecured Claim.

Class 2    Secured Claim of Plantation Federal.    Secured, Impaired.

Plantation Federal has agreed to give the Debtor 18 months to market and sell the property, or market and develop the property ("Plantation Settlement"). The terms of the marketing period are set forth in greater detail by separate agreement between the Debtor and Plantation Federal (Such agreement will be provided as a supplement to the Disclosure Statement). This agreement calls for the Debtor to meet certain milestones to stay in compliance with the Plantation Settlement. The Debtor will have until March 15, 2012 to sell the first $1,000,000.00 of Plantation Federal's collateral or have a ready, willing and able purchaser of property that will net Plantation Federal that amount of money. If the Debtor meets this first milestone, the Debtor will have until September 15, 2012 to sell or have ready and willing buyers of $1,000,000 net from the collateral. If the Debtor meets this second milestone, the Debtor will have until March 15, 2013 to dispose of all Plantation Federal property or have a ready and willing buyer as defined by the Plantation Settlement. The terms in this Plan will not modify the terms of any agreement but serve only to explain the terms of the separate agreement.

If the Debtor defaults under the Plantation Settlement the Debtor will have 15 days to cure such a default. No adequate protection payments are necessary as Plantation Federal is adequately protected by the equity in the property. Interest will accrue against the Debtor's equity in the property. The Debtor will pay and keep all property taxes current during the 18-month period. In addition, the Debtor will pay the outstanding property taxes using sources provided by a third party.

By operation of the Plan, Plantation Federal will be granted replacement liens to the same extent Plantation Federal's security existed pre-petition. Any sale will be subject to the liens of Plantation Federal up to the outstanding debt owed to Plantation Federal.

The Debtor believes that even after the sale of all of Plantation Federal's collateral, a surplus

10

of funds will be available to pay to the unsecured creditors in Class 6 below, even after paying all Class 4 and 5 creditors. Those funds will be used to pay the Debtor's unsecured creditors in Class 6. The Debtor is still reviewing the scheduled and filed claims in this case and has yet to file any claims objections in this case. For this reason, and the uncertainty in the amounts the Debtor will realize from the sale of the property, the Debtor cannot determine how much will be available to the Unsecured Class 6 creditors.

The Debtor believes that Plantation Federal is fully secured, but in the unlikely event Plantation Federal's collateral does not fully repay Plantation Federal, any deficiency shall be treated as a Class 6 General Unsecured Claim.

Class 3        Secured Claim of First Palmetto        Secured, Impaired.

First Palmetto has agreed to allow the Debtor 10 months to market and sell the property in order to repay the debt and generate funds in excess of the outstanding obligations. In exchange for this time, the Debtor has agreed to make adequate protection payments monthly to First Palmetto in the amount of $5,000. The Debtor has also agreed to give First Palmetto a deed-in-lieu of foreclosure to be held in the event of a default by the debtor, or until the end of the 10-month period. First Palmetto's collateral will be marketed and sold through the Debtors court authorized real-estate professional. The Debtor will provide First Palmetto with any offers to purchase the collateral and such offers shall be considered in good faith

By operation of the Plan, First Palmetto will be granted replacement liens to the same extent First Palmetto's security existed pre-petition. Any sale will be subject to the liens of First Palmetto up to the outstanding debt owed to First Palmetto.

The Debtor believes that equity exists in the property such that after paying any closing costs the Debtor will have excess funds that will be available to contribute to the repayment of the Class 6 unsecured creditors.

The Debtor believes that First Palmetto is fully secured, but in the unlikely event First Palmetto's collateral does not fully repay First Palmetto, any deficiency shall be treated as a Class 6 General Unsecured Claim.

Class 4        Administrative Claims.  Unimpaired.

This Class consists of all Administrative Claims. It is anticipated that this Class will solely consist of Administrative Claims of the Debtor's attorneys, its realtor, any post-petition expenses, and other professionals of the Estate, as well as any and all quarterly fees of the United States Trustee.

The Debtor, or a related third party, will pay all such Claims in full on the Effective Date of the Plan or at such later date as may be agreed upon between the Debtor, RBC Bank, and the Debtor's Administrative Claimants. Payments to Claimants in this Class will only be made after Court approval, where such approval is required.

Furthermore, the principal of the Debtor, Kyle Tauch has agreed to pay any post-petition expenses that are not included in the budget, the United States Trustee's fees, and the Debtor's attorney's fees. Mr. Tauch has agreed that he will also pay any payments to First Palmetto, and taxes related to the First Palmetto property and Plantation Federal.

Class 5        Priority Claims. Priority, Unimpaired

Each holder of a Class 5 Claim that is an Allowed Priority Claim shall be paid in cash in an amount equal to such Allowed Priority Claim, after the Debtor has finalized any and all Priority Claim objections. The Debtor believes that there are no Class 5 claims. To the extent it is determined that there are any *de minimis* class 5 claims, those claims will be paid from the proceeds derived from the sale of the above-mentioned collateral.

Class 6        General Unsecured Creditors.        Unsecured Non-priority, Impaired.

This Class consists of any and all Unsecured Creditors of the Debtor's Estate. No payment to the unsecured creditors will be made until such time as the Debtor has sold assets to generate funds in excess of the Secured Claims, the Administrative Claims, and the Priority Unsecured Claims in Classes 1-5. Such funds will only be paid pro *rata* after the Debtor has finished its Claims objections, but distributions to Class 6 creditors will only be made after the payment of all Claims in Class 5 as set forth hereinabove. The Debtor believes significant equity exists in the properties that would allow it to make a distribution to the Unsecured Creditors in Class 6.

Class 7        Equity.        Equity Interest non-priority, Impaired.

Class 7 is comprised of the Equity Interests of Kyle Tauch, whose Equity Interests and any Claims he may hold shall be treated as subordinate to all other Claims against the Estate. Only after payment in full of Allowed Claims in all prior Classes (Classes 1-6), holders of Equity Interests shall receive a *pro rata* share of distributions based upon the Equity Interests held as of the date of Confirmation. As of the Effective Date, all Equity Interests shall be deemed only to represent the right to receive distributions hereunder, and holders of Equity Interests shall be enjoined from transferring such Equity Interests or from taking other action that may adversely impact the Estate, including the taking of a worthless stock deduction.

## VII.  FEASIBILITY OF PLAN

It is provided in 11 U.S.C. §1129(a)(11) that in order for a plan to be confirmed, it must be demonstrated that the plan is not likely to be followed by a liquidation or the need for further reorganization of the Debtor or any successor of the Debtor, unless the liquidation or reorganization is proposed in the plan.  The Debtor's Plan proposes a liquidation of part or all of the Estate and the Debtor asserts that this is the best recovery available for all parties involved.  The Debtor believes that a controlled liquidation of certain parcels of property through a focused and strategic marketing campaign will maximize the amount realized by the estate and that those amounts would be in excess of any funds that would be realized by a liquidation. The Debtor's Plan is proposed as a liquidating Plan and as such would not be followed by a liquidation. The Debtor asserts that the Plan is feasible and in the best interest of the Debtor, its creditors, its equity holders, and other interested parties.

## VIII.  RISKS ASSOCIATED WITH THE PLAN

Both the confirmation and consummation of the Plan are subject to a number of risks.  There are certain risks inherent in the bankruptcy process generally and in the liquidation process under the Bankruptcy Code.  For instance, parties-in-interest may object to the Plan's classification of Claims and Equity Interests.  The Debtor believes that the classification set forth under the Plan complies with the Bankruptcy Code's requirements, but there is no assurance that the Bankruptcy Court will reach the same conclusion.  In addition, the Plan may fail to satisfy the vote requirements under the Bankruptcy Code.  If votes are received in number and amount sufficient to enable the Bankruptcy Code to confirm the Plan, the Debtor intends to seek confirmation of the Plan promptly.  Otherwise, the Debtor will have to consider alternatives to the Plan.  There can be no assurances that the terms of any such alternative would be similar to or as favorable to the holders of Allowed Claims as those proposed under the Plan.

As set forth above, there is a risk that the requisite acceptances to confirm the Plan may not be received.  Additionally, if certain standards set forth in the Bankruptcy Code are not met, the Bankruptcy Court will not confirm the Plan even if the holders Claims and Equity Interests vote to accept the Plan.  Although the Debtor believes that the Plan meets such standards, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  If the Bankruptcy Court were to

13

determine that such requirements were not met, it could require the Debtor to re-solicit acceptances, which could delay and/or jeopardize confirmation of the Plan. The Debtor believes that solicitation of votes on the Plan will comply with Bankruptcy Code section 1126(b) and that the Bankruptcy Court will confirm the Plan.

The Debtor reserves the right to modify the terms and conditions of the Plan as necessary for Confirmation and the Effective Date of Confirmation, which could change the treatment of Classes, including non-accepting Classes. Modifications of the Plan may be required in order to obtain Confirmation, and any such modifications may require a re-solicitation of acceptances. Confirmation of the Plan and the occurrence of the Plan's Effective Date are also subject to certain conditions as set forth in the Plan.

The Debtor also may object to the amount or classification of various Claims. Except as otherwise provided in the Plan, the Debtor reserves the right to object to the amount or classification of any Claim under the Plan. The estimates of distributions and similar matters set forth in the Plan or Disclosure Statement or related documents cannot be relied upon by any Holder of a Claim where its Claim is or may be subject to an objection. Any Holder of a Claim that is or becomes subject to any objection may not receive its expected share of any estimated distributions depending on the resolution of any Claim objection.

A number of unknown factors make certainty in creditor recoveries impossible to forecast. For instance, the Claims estimates set forth herein are based on various assumptions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect. Such differences could adversely affect the percentage recovery to holders of Allowed Claims under the Plan. However, the Debtor believes and asserts despite the foregoing risks that the Plan is the best alternative available to Claimants.

## IX.    CERTAIN TAX CONSEQUENCES

The confirmation and execution of the Plan may have tax consequences to holders of Claims and Equity Interests, as well as to the Debtor. As a result of losses suffered, the Debtor has certain Net Operating Losses. The Plan is intended to allow the Debtor to retain the right to apply those Net Operating Losses to offset future arising tax liabilities, if any.

The Plan also may have tax consequences for Holders of Claims and Equity Interests. The tax consequences arising from the Plan varies depending upon the circumstances of each Holder. Neither

the Debtor, nor the parties consenting to the Plan offer an opinion as to any federal, state, local or other tax consequences to holders of Claims and Equity Interests of the confirmation of the Plan. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO ANY FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.  THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL OR TAX ADVICE TO ANY CREDITOR OR INTEREST HOLDER

## X. LIQUIDATION AND OTHER ALTERNATIVES TO PLAN CONFIRMATION

### Alternatives.

There are three possible consequences if a Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan: (a) the Bankruptcy Court could dismiss the Debtor's Bankruptcy Case; (b) the Bankruptcy Court could consider an alternative plan of reorganization filed by some other party, or (c) the Debtor's Bankruptcy Case could be converted to a liquidation case under Chapter 7 of the Bankruptcy Code.  These alternatives are described briefly below.

### Dismissal.

If the Debtor's Bankruptcy Case were to be dismissed, the Debtor would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code.  Any secured creditors would be expected to immediately exercise their rights as secured creditors to foreclose and seize the Debtor's assets.  Dismissal would force a race among secured creditors and other creditors to take over and dispose of any remaining property of the Debtor.  This property is the keystone to the Debtor's Plan and the retention of these parcels is necessary to provide any recovery to the Unsecured Creditors.

### Confirmation of an Alternative Plan.

If the Plan is not confirmed, the Debtor or any other party-in-interest could attempt to formulate a different plan.  If an alternative plan were proposed, it would more than likely be substantially similar to the current Plan in that it would propose a contribution conditioned on the release of the claims against such contributing parties.  It would also contemplate the liquidation of the Debtor's remaining Assets and the distribution of cash to Holders of Claims.  The Debtor believes that the Plan described herein enables the Creditors and all parties-in-interest to realize the best payout

15

under the circumstances and any other alternative plan would not likely provide any greater return to Claimants. The Debtor is open to collaborating with the constituents who would have an interest in this case and would propose an alternative Plan. Due to the time constraints placed on Debtor's counsel, the Debtor has been unable to undertake this effort.

## **Chapter 7 Liquidation.**

The primary advantage of the Plan over a Chapter 7 liquidation is that holders of allowed general unsecured Claims are more likely to receive distributions, which would not likely be available in a Chapter 7 case. Because the Plan contemplates that: (i) the Bankruptcy Court's involvement will diminish substantially after the Effective Date and (ii) the Debtor's counsel who is already familiar with the Assets of and Claims against the Estate, shall continue the process of Claims resolution, without the necessity for additional investigation by a Chapter 7 Trustee and his/her separate new professionals, there will not be an additional layer of administrative expenses.

At a minimum, a Chapter 7 Trustee would retain his/her own counsel, who would ordinarily need to devote a substantial amount of time reviewing the status of Claims and getting up to speed on various matters. Such review would include a substantial amount of time duplicating tasks previously performed by other Professionals in the case, thereby increasing both the costs and the time necessary to liquidate the Estate. Also, the statutory fee paid to the Chapter 7 Trustee would further deplete the Estate.

If this case were converted to a Chapter 7 proceeding, dividend distributions, if any, would be delayed for months because the Bankruptcy Court is required to establish an additional bar date for filing proofs of Claim against the Estate. Upon conversion to Chapter 7, unsecured creditors are given additional time to file Claims and governmental authorities are provided even longer to file their additional proofs of Claim. Upon expiration of the Chapter 7 bar dates, the Chapter 7 Trustee and/or his attorney would likely require some amount of time to review the Claims and undertake the Claims resolution process. Thus, not only would any dividends paid to creditors suffer because Chapter 7 professional fees would be paid at the expense of these Claims, but unsecured creditors would actually have to wait months longer for any distribution. Consequently, the Debtor believes that using current management with knowledge of the property and market, the Plan's lower total administrative costs, and the more expeditious process of remaining in a Chapter 11 combine to result in higher recovery for creditors than a Chapter 7 liquidation could ever offer.

Furthermore, it is likely that any trustee appointed in this case would see that the Debtor's only

16

assets are secured by mortgages and determine that the time and cost necessary to make those assets value exceed those liens would be beyond the trustees ability and time constraints. That being the case, it all probability, the trustee would abandon the property resulting in the loss of any hope of recover to the unsecured creditors.

RESPECTFULLY SUBMITTED on this the 5th day of September, 2011, at Columbia, South Carolina.

                McCARTHY LAW FIRM, LLC

                By: /s/Sean P. Markham
                    G. William McCarthy, Jr., I.D.#2762
                    Daniel J. Reynolds, Jr., I.D. #9232
                    Sean P. Markham, I.D., #10145
                    *Attorneys for the Debtor*
                    1517 Laurel Street (29201)
                    Post Office Box 11332
                    Columbia, South Carolina 29211
                    Tele: (803) 771-8836