# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

In re:

K.T. Spears Creek, LLC,

Debtor.

Chapter 11

Case No. 11-04241-jw

# AMENDED PLAN OF REORGANIZATION

Filed by the Debtor-in-Possession

On November 3, 2011

# Table of Contents

ARTICLE I  HISTORY AND OTHER GENERAL CONSIDERATIONS RELATING TO THE PLAN OF LIQUIDATION ..................................................................................................................1

1.1  BACKGROUND ...................................................................................................................1

1.2  FINANCIAL CONDITION OF THE DEBTOR .........................................................................1

1.3  THE DEBTOR'S PROCEEDINGS UNDER CHAPTER 11 ........................................................1

1.4  DEFINITIONS ......................................................................................................................1

ARTICLE II PLAN OF REORGANIZATION ..........................................................................4

2.1  PLAN ASSETS ....................................................................................................................4

2.2  PLAN FRAMEWORK AND SUMMARY .................................................................................5

2.3  CLASSIFICATION AND TREATMENT OF CREDITORS ..........................................................8

    Class 1  Secured Claim of RBC. Secured, Impaired. ..............................................8

    Class 2  Secured Claim of Plantation Federal.  Secured, Impaired. .......................9

    Class 3  Secured Claim of First Palmetto  Secured, Impaired. ............................10

    Class 4  Administrative Claims. Unimpaired...........................................................11

    Class 5  Priority Claims. Priority, Unimpaired .....................................................11

    Class 6  General Unsecured Creditors.  Unsecured Non-priority, Impaired. ........12

    Class 7  Equity.   Equity Interest non-priority, Impaired.......................................12

ARTICLE III  FEASIBILITY OF PROPOSED PLAN OF LIQUIDATION .......................12

ARTICLE IV ACCEPTANCE OR REJECTION OF PLAN .................................................13

i

4.1 Voting Procedure.................................................................................................13

4.2 Voting Classes......................................................................................................13

4.3 Acceptance By Class of Claims............................................................................13

**ARTICLE V MEANS OF EFFECTUATING PLAN** ...............................................................**14**

5.1    Effectuating Plan..............................................................................................14

5.2    11 U.S.C. § 1129 (5)(A)(I)&(II) Disclosure.....................................................14

5.3    Conditions precedent to Confirmation ............................................................14

5.4    Implementation on the Effective Date .............................................................14

**ARTICLE VI STATUS OF THE DEBTOR AFTER CONFIRMATION** ...........................................**15**

**ARTICLE VII EXECUTORY CONTRACTS**.....................................................................**15**

**ARTICLE VIII JURISDICTION** .................................................................................**15**

8.1    Retention of Jurisdiction...................................................................................15

8.2    Prosecution and Defense of Claims..................................................................15

**ARTICLE IX POST-CONFIRMATION ACTS** ..................................................................**16**

**ARTICLE X "CRAM DOWN" FOR IMPAIRED CREDITORS NOT ACCEPTING THE PLAN** ..**16**

**ARTICLE XI RELEASE AND EXCULPATION OF DEBTOR AND CO-DEFENDANTS**...............**16**

11.1    Discharge of the Debtor ..................................................................................16

# PLAN OF LIQUIDATION

The Debtor-in-Possession, K.T. Spears Creek, LLC, ("Debtor"), proposes the following Plan of Liquidation ("Plan") pursuant to Chapter 11 of the U. S. Bankruptcy Code.

## ARTICLE I  HISTORY AND OTHER GENERAL CONSIDERATIONS RELATING TO THE PLAN OF LIQUIDATION

**1.1        Background**

The history and background of the Debtor are provided in the Debtor's Amended Disclosure Statement filed on November 3, 2011 ("Disclosure Statement").

**1.2        Financial Condition of the Debtor**

The current financial condition of the Debtor is set forth in the bankruptcy schedules and monthly operating reports filed with the Court. Upon information and belief, all post petition obligations, except fees incurred by attorneys, have been paid in the ordinary course.

**1.3        The Debtor's Proceedings Under Chapter 11**

The information found in the Disclosure Statement provides an adequate history as to the proceedings by the Debtor in this Case.

**1.4        Definitions**

1. Acceptance.  A specific Class of Claims has accepted a plan when such plan has been accepted by those voting individual creditors in that class that hold at least two-thirds (2/3) in amount ($'s) and more than one-half (1/2) in number (greater than 50%) of the voting individual Allowed Claims of that class of creditors.  A class of interests has accepted a plan if such plan has been accepted by holders of such interest that hold at least two-thirds (2/3) in the amount of the allowed Equity Interest of such class held by holders of such Equity Interest (i.e., number of shares held by shareholders or partners) that have voted in confirmation of such plan.  It is important to note that computation in the confirmation voting process is based only upon the total amount of claims or interests actually voting rather than on claims or interests proven and allowed. Notwithstanding any other provision of the Plan, a class that is unimpaired under the Plan is deemed by law to have accepted the Plan, and solicitation of acceptances with respect to such class is not otherwise required.

2. Administrative Claim shall mean a Claim for payment of an administrative expense of the kind specified in Bankruptcy Code Section 503(b) and entitled to priority pursuant to Bankruptcy Code Section 507(a)(2).

3. <u>Allowed</u> means, with reference to any Claim: (i) a Claim against the Debtor, proof of which, if required, was filed on or before the applicable bar date, which is not a Contested Claim; (ii) if no proof of claim was so filed, a Claim against the Debtor that has been or hereafter is listed by the Debtor on its schedules as liquidated in amount and not disputed or contingent, or (iii) a Claim allowed hereunder or by final order.  An Allowed Claim does not include any Claim or portion thereof which has been subsequently withdrawn, disallowed, released or waived by the holder thereof or pursuant to an order of the Bankruptcy Court.  Unless otherwise specifically provided in the Plan, or by an order of the Bankruptcy Court or otherwise provided under Bankruptcy Code Section 506(b), an Allowed Claim shall not include any amount for punitive or exemplary damages, penalties, fines or post-petition interest.

4. <u>Avoidance Actions</u> shall mean any and all avoidance or recovery actions under Sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or under related federal or state law, whether or not litigation has been commenced with respect to such causes of action as of the Effective Date.

5. The <u>Case</u> shall mean In re: K.T. Spears Creek, LLC, Case No. 11-04241-jw.  Such case was initially commenced in the Southern District of Texas Case No. 11-33991-H3-11 and was then transferred to the District of South Carolina.

6. <u>Chapter 7</u> shall mean 11 U.S.C. Sections 701 <u>et</u> <u>seq.</u>

7. <u>Chapter 11</u> shall mean 11 U.S.C. Sections 1101 <u>et</u> <u>seq.</u>

8. <u>Claim</u> shall have the meaning given in Bankruptcy Code Section 101(5).

9. <u>Class</u> shall mean all types of claims or interests (<u>i.e.</u>, secured, priority, unsecured or interests) which are substantially identical in kind or nature and are grouped together without any unfair discrimination or treatment for payment by the Plan.

10. <u>Code</u> or <u>Bankruptcy Code</u> refers to title 11 of the United States Code.

11. <u>Confirmation</u> shall mean the entry of the order by the Bankruptcy Court in this Case confirming the Plan pursuant to Bankruptcy Code Section 1129.

12. <u>Contested Claim</u> shall mean a Claim against the Debtor that is: (i) listed in the Debtor's schedules as disputed, contingent, or unliquidated, and as to which a proof of claim has been timely filed; (ii) listed in the Debtor's schedules as undisputed, liquidated, and not contingent, and as to which a proof of claim has been filed with the Bankruptcy Court, to the extent the proof of claim amount exceeds the amount provided for in the Debtor's schedules; or (iii) the subject of an objection which has been or may be timely filed, and which claim has not been disallowed by Bankruptcy Court order.  To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Contested Claim only to the extent of the objection.

13. The <u>Court</u> or Bankruptcy Court shall mean the United States Bankruptcy Court for the District of South Carolina.

14. The <u>Debtor</u> shall mean K.T. Spears Creek, LLC.

15. <u>Effective Date of the Plan</u> or <u>Effective Date</u> is the third business day after the Order confirming the Plan is entered by the Court and becomes a Final Confirmation Order.

16. <u>Estate</u> shall mean the estate created in the Debtor's Chapter 11 Case under Bankruptcy Code Section 541.

17. <u>Equity Interest</u> shall mean equity securities (shareholders' interest), partnership interests, proprietorship interests, or other ownership interests in the Debtor.

18. <u>Executory Contracts</u> shall mean all contracts or agreements not completed and to be performed or satisfied by the parties in the future.

19. <u>Final Confirmation Order</u> shall mean the order issued by the Bankruptcy Court in this Case confirming the Plan, the operation or effect of which has not been stayed, reversed, or amended and as to which order (or any revision, modification, or amendment thereof), the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending.

20. <u>First Palmetto</u> – Frist Palmetto Savers Bank is one of the Debtor's 3 secured lenders. First Palmetto asserts a principal balance due on the loan of $885,719.46, plus interest in costs.  The property is secured by 7.36 acres of property, which abuts the Greenhill Parrish Apartments.

21. <u>First Savers</u> – originated the note now held by Plantation Federal

22. <u>Greenhill Parrish Apartments</u> – Greenhill Parrish Crossing Apartment Homes is the Debtor's apartment complex that is security for the loan made by RBC Bank.  The property is located at 10682 Two Notch Rd, Elgin, SC 29045.  www.ghpcrossing.com/.

23. <u>Holder of a Claim, Claim Holder, or Claimant</u> shall mean any party that holds a Claim against the Debtor.

24. <u>Impaired</u> shall mean a Claim or Equity Interest that is impaired within the meaning of Bankruptcy Code Section 1124.

25. The <u>Plan</u> shall mean this Amended Plan of Reorganization of the Debtor under Chapter 11, filed with the Court on November 3, 2011, and any amendments, modifications and supplements thereto.

26. <u>Plantation Federal</u> – the successor to First Savers Bank and now the holder of the note secured by the 66 acre tract of property owned by the Debtor.  Plantation Federal asserts that there is $5,939,503.69 in principal outstanding on the loan, plus interest and costs.

27. <u>Priority Claims</u> shall mean all claims, other than Administrative Claims, entitled to priority under Bankruptcy Code Section 507.

28. <u>Professionals</u> shall mean any attorney, accountant, financial advisor, or noticing agent, working for the benefit of the Debtor, the Debtor's principal, and the Co-Defendants.

29. <u>RBC Bank</u>- one of the Debtor's 3 secured lenders and is also referred to herein as

"RBC".  RBC Bank originally loaned the Debtor approximately $19,700,000.00 dollars to fund the infrastructure and development of the Greenhill Parrish Apartments.  The apartment complex, the rents from the apartment complex, any personalty belonging to the apartment complex, and the land on which apartment complex sits were pledged as collateral for the RBC Bank loan.

30.  <u>Secured Claim</u> shall mean each individual Claim completely or partially secured by real estate mortgages, security agreements, assignment agreements, consignment agreements, chattel mortgages, recorded lease-purchase agreements, liens or any other legal encumbrance which is entitled to secured status under Title 36 of the Code of Laws of South Carolina (UCC provisions), South Carolina law or other applicable law.

31.  <u>Substantial Consummation</u> shall refer to that date and time on which the transfer of all or substantially all of the property proposed by the Plan to be transferred has been achieved; and the commencement of the distribution of some payments under the Plan has begun.

32.  <u>Unimpaired</u> shall mean a Claim or Equity Interest that is not impaired within the meaning of Bankruptcy Code Section 1124.  Unimpaired Claims are deemed to have accepted the Plan by specific provisions of the Code and solicitation of acceptances with respect to such Class from the holders of Claims in such Class is not required.

33.  <u>Unsecured Claims</u> shall mean all Claims against the Debtor other than Secured Claims, Priority Claims, Equity Interests, and Administrative Claims.

**NOTE:**  <u>The defining of the various parties in interest and claimants against this Estate in no way imputes any relative priority among them nor is it to be construed to validate or approve any of their Claims.</u>

## ARTICLE II PLAN OF REORGANIZATION

**2.1    Plan Assets**

As described in the Disclosure Statement, the Debtor is currently operating as a Debtor-in-Possession subject to the Final Cash Collateral Order entered in this matter.  The Debtor is the owner of three parcels of property.  One of those parcels has a 240-unit residential apartment complex known as the Greenhill Parish Apartment Complex.  As of the date of the Debtor's bankruptcy filing, the apartment complex was approximately 96% occupied.  The other two properties are unimproved parcels of land that surround the already developed apartment complex.

The properties breakdown as follows:

| Property | Acreage | Est. Value |
|---|---|---|
| Greenhill Parish Apartment Complex | 30.43 | Unknown |
| 66 Acre mixed use site | 66 | $11,000,000.00 |
| Two Notch Frontage | 7.36 | $1,800,000.00 |

4

**2.2      Plan Framework and Summary**

The Debtor proposes to reorganize its debts by reducing its total debt, through the sale and development of the two unimproved parcels, and the marketing and sale of the Greenhill Apartment Complex.  The proceeds from the sale of the property will be used to repay the Debtor's creditors.  The Debtor is still reviewing the scheduled and filed claims in this case and has yet to file any claims objections.  The Debtor specifically reserves all rights to object to scheduled and filed claims in this matter.  For this reason, and the uncertainty in the amounts the Debtor will realize from future sales of the properties, the Debtor cannot determine how much will be available to the Unsecured Class 6 creditors.  Below, the Debtor describes in greater detail how it will market and sell the property.  The Debtor believes that any payment will not be *de minimis* and through the Debtor's marketing and sales efforts, there will be a greater amount of money available for all classes than would be available through a Chapter 7 liquidation.

GREENHILL PARISH APARTMENT COMPLEX (First Mortgage Holder – RBC)

The Debtor and RBC Bank have recently reached a consensual resolution of their issues in this matter.  The terms of the RBC Settlement Agreement are more fully set forth in the Exhibit A attached hereto.  Pursuant to the Settlement Agreement between the Debtor and RBC, the Debtor will retain Phases I and II of the Greenhill Parish Apartment complex property (the "Apartment Property") for a period of one (1) year from the date of confirmation (the "Settlement Period"), during which the Debtor will market the Apartment Property for sale.  The Debtor shall select the real estate agent/broker to market this Apartment Property during the one (1) year Settlement Period, which selection shall be subject to the approval of RBC Bank.  During the marketing period, the Debtor will continue to employ Greystar as its property management company.  RBC Bank will continue to allow Greystar to use the funds received from the Apartment Property rents, which constitute collateral of RBC Bank, to cover the operating expenses of the property, including payment of the property manager's fees, so long as those costs and expenses fall within the parameters of the Final Cash Collateral Budget and Order entered by this Court.  Any funds received in excess of the operating expenses, as set forth in the Court's September 16, 2011 consent Order Granting the Debtor's Use of Cash Collateral, will be turned over to RBC Bank and applied accordingly to the RBC Bank claim.  By operation of the Plan and pursuant to the September 16, 2011 Order on Cash Collateral, RBC Bank is being granted replacement liens to the same extent RBC Bank's security existed pre-petition. RBC Bank has agreed to fund the payment of any taxes and insurance for the Greenhill Parish Apartment complex from the excess cash flow distributed to RBC Bank, but any such amounts paid by RBC Bank will be added to the RBC Bank claim as protective

advances.  Similarly, any and all post-petition payments by the Debtor to RBC Bank or sweeps of the Debtor's accounts by RBC Bank shall be deducted from the RBC Bank Note balance.  The outstanding balance due to RBC Bank is being restructured to accrue interest at 5% from the date of execution of the settlement agreement.  The Debtor has agreed to provide RBC Bank with a deed in lieu of foreclosure to hold in escrow and only to be filed if the Debtor defaults on any of its obligations pursuant to the RBC Settlement Agreement or at the expiration of the Settlement Period.  In addition, upon a material default by the Debtor of the RBC Settlement Agreement and only after the expiration of any cure period set forth herein or at the expiration of the Settlement Period, RBC Bank shall have the right, in its sole discretion, to complete the pending foreclosure.    RBC Bank has agreed to cap any deficiency remaining after liquidation or foreclosure of its collateral at $1.5 million in aggregate against the Debtor and Kyle Tauch.  At the expiration of the Settlement Period, if the Apartment Property has not been sold or refinanced, RBC Bank shall be free to file the Deed in Lieu of Foreclosure or complete its pending foreclosure and pursue collection of its deficiency against Tauch and the Debtor as limited herein.

The RBC Settlement Agreement is attached hereto as Exhibit A and is incorporated herein as if fully set forth herein verbatim.


66 ACRES (First Mortgage Holder – Plantation Federal)

The Debtor is in the process of marketing the 66-acre tract for future development.  Currently the property is raw land but is located close to several hundred residential apartment dwellings, including the Debtor's 240-unit apartment complex, Greenhill Parish Apartments.  The proposed development would place a mixed-use housing, office, and shopping development on the property in close proximity to the above-mentioned developments.  The Debtor has discussed this development with Plantation Federal who currently holds the mortgage on the property.

Plantation Federal and the Debtor have reached a consensual agreement (the "Plantation Settlement") as to their treatment in this matter as set forth in detail in the October 12, 2011 Consent Order (Docket # 125 in this matter) attached to and incorporated in this Plan as Exhibit B.  Plantation Federal has agreed to give the Debtor up to 18 months to market and sell the property, or market and develop the property so long as the Debtor meets certain thresholds by certain dates.  The terms of the marketing period are set forth in greater detail in the October 12, 2011 Consent Order attached to the Plan.

The Plantation Agreement calls for the Debtor to meet certain milestones to stay in compliance with the Plantation Settlement.  The Debtor has met the first requirement that the Debtor redeem the collateral from the Richland County, South Carolina taxing authority by October 1, 2011.  The Debtor will have until March 15, 2012 to pay $1 million or have a ready, willing and able purchaser of property

6

that will net Plantation Federal that amount of money.  If the Debtor meets this first milestone, the Debtor will then have until September 15, 2012 to sell or have ready and willing buyers of another $1,000,000 of property.  If the Debtor meets this second milestone, the Debtor will then have until March 15, 2013 to pay Plantation Federal in full or dispose of all of the remaining Plantation Federal collateral.

If the Debtor defaults under the Plantation Settlement the Debtor will have 15 days to cure such a default.  No adequate protection payments are necessary as Plantation Federal is adequately protected by the equity in the property.  Interest will accrue against the Debtor's equity in the property.  The Debtor (through a third party) will pay and keep all property taxes current during the 18-month period.   The Debtor has agreed execute a deed-in-lieu of foreclosure to be held in escrow by the attorney for Plantation Federal and only to be filed if the Debtor defaults on the Plantation Agreement and fails to cure such default within the applicable cure period. The terms of the October 12 Consent Order attached hereto as Exhibit B are specifically incorporated herein as if set forth herein verbatim.

By operation of the Plan, Plantation Federal will be granted replacement liens to the same extent and priority as Plantation Federal's security existed pre-petition.  Any sale will be subject to the liens of Plantation Federal up to the outstanding debt owed to Plantation Federal.

TWO NOTCH ROAD FRONTAGE (First Mortgage holder – First Palmetto)

First Palmetto and the Debtor have reached a consensual agreement (the "First Palmetto Settlement") in this matter as set forth in detail in the September 28, 2011 Consent Order (Docket # 120 in this matter) attached to and incorporated in this Plan as Exhibit C.  First Palmetto is the mortgage holder of the Two Notch Road Frontage property held by the Debtor. Pursuant to the First Palmetto Settlement, as set forth in more detail in the September 28, 2011 Consent Order attached as Exhibit C to the Debtor's Plan, First Palmetto has agreed to allow the Debtor 10 months (beginning September 15, 2011) to market and sell the property in order to repay the debt and generate funds in excess of the outstanding obligations.  Debtor or its principal has agreed to employ a licensed real estate professional to market the property.  In exchange for the ten (10) month marketing period, the Debtor has agreed to make monthly adequate protection payments to First Palmetto in the amount of $5,000 with the first payment being due September 15, 2011.  The Debtor's principal, Kyle Tauch, is a guarantor under the First Palmetto debt and has specifically agreed that he will not be personally discharged of his obligations under such guaranty.

This Two Notch Road frontage property is the subject of a condemnation suit by Richland County, South Carolina for converting part of the property into a school bus turn lane.  The Debtor has agreed as a part of the First Palmetto Settlement to consult with First Palmetto on the adequacy of any condemnation award and has agreed that either party may litigate the condemnation action at their own

cost if such party believes any such condemnation award is inadequate. Debtor has also agreed to resolve any access issues caused by the condemnation action or the loss of any of the Debtor's real properties as a result of the bankruptcy action in a manner reasonably satisfactory to First Palmetto. Any funds received from the condemnation suit will be paid to First Palmetto, until First Palmetto is paid in full.

To ensure performance under the First Palmetto Agreement, the Debtor has agreed to give First Palmetto a deed-in-lieu of foreclosure to be held in escrow until the end of the 10-month marketing period only to be filed upon a default under the First Palmetto Agreement after the expiration of a 15-day notice and cure period. The Debtor will provide First Palmetto with any offers to purchase the collateral and such offers shall be considered in good faith.

By operation of the Plan, First Palmetto is granted replacement liens to the same extent First Palmetto's security existed pre-petition. Any sale will be subject to the liens of First Palmetto up to the outstanding debt owed to First Palmetto. The terms of the September 28, 2011 Consent Order (Docket # 120 in this matter) attached hereto as Exhibit C are hereby incorporated in this Plan as if set forth herein verbatim.

**2.3    Classification and Treatment of Creditors**

Class 1            Secured Claim of RBC Bank.    Secured, Impaired.

RBC Bank asserts a first priority secured claim of $22,516,541.16, plus actual attorneys' fees in the amount of $60,924.44 for a total of $22,577,465.60 on the Debtor's 240-unit apartment complex and the vacant Phase II land that is part of that parcel, an assignment of rents from the Debtor, and guaranty by the Debtor's principal, Kyle Tauch. RBC Bank also reserves the right for additional attorneys' fees as may be allowed by the Court in the event the Apartment Complex sells for more than $22,577,465.60.

Pursuant to the RBC Settlement Agreement, the Debtor will retain Phases I and II of the Greenhill Parish Apartment complex property for a period of one (1) year from the date of confirmation, during which the Debtor will market the property for sale. The Debtor shall select the real estate agent/broker to market this property during the one (1) year period, which selection shall be subject to the approval of RBC Bank. During the marketing period, the Debtor has will continue to employ Greystar as its property management company. RBC Bank will continue to allow Greystar to use the funds received from the property rents, which constitute collateral of RBC Bank, to cover the operating expenses of the property, including payment of the property manager's fees. Any funds received in excess of the operating expenses, as set forth in the Court's September 16, 2011 consent Order Granting the Debtor's Use of Cash Collateral, will be turned over to RBC Bank and applied accordingly to the RBC Bank claim. RBC Bank has agreed to fund the payment of any taxes and insurance for the Greenhill Parish Apartment complex from the excess cash flow distributed to RBC Bank, but any such amounts paid by RBC Bank

will be added to the RBC Bank claim as protective advances.  Similarly, any and all post-petition payments by the Debtor to RBC Bank or sweeps of the Debtor's accounts by RBC Bank shall be applied to the RBC Bank Note balance.  The outstanding balance due to RBC Bank shall accrue interest at a reduced rate of 5% per annum from the date of the execution of the settlement agreement.  The Debtor has agreed to provide RBC Bank with a deed in lieu of foreclosure to hold in escrow and only to be filed if the Debtor defaults on any of its obligations pursuant to the RBC Settlement Agreement or at the expiration of the Settlement Period.  In addition, upon a material default by the Debtor of the RBC Settlement Agreement and only after the expiration of any cure period set forth herein or at the expiration of the Settlement Period, RBC Bank shall have the right, in its sole discretion, to complete the pending foreclosure.

By operation of this Plan and pursuant to the September 16, 2011 Order on Cash Collateral, RBC Bank is being granted replacement liens to the same extent RBC Bank's security existed pre-petition.

The terms in the Disclosure Statement and Plan are not intended to modify the terms of the RBC Settlement Agreement but serve only to explain its terms.  The terms of the RBC Settlement Agreement attached as Exhibit A are incorporated herein as if fully set forth herein verbatim.

The Debtor believes that RBC Bank may be fully secured, and any property and funds remaining after payment of RBC Bank in full shall be used for payment of any unpaid claims of Classes 4, 5, and 6 in the order and priority shown hereinbelow.  However, it is possible that the sale of RBC Bank's collateral will not fully repay RBC Bank.  To the extent RBC Bank is not fully repaid from the liquidation of its collateral, any deficiency shall be capped at a maximum $1.5 million claim and shall be treated as a Class 6 General Unsecured Claim.

Class 2         Secured Claim of Plantation Federal.            Secured, Impaired.

Pursuant to the Plantation Settlement, Plantation Federal has agreed to allow the Debtor up to 18 months to market, develop and sell the 66-acre tract comprising Plantation's collateral.  The Plantation Agreement calls for the Debtor to meet certain milestones to stay in compliance with the Plantation Settlement.  The Debtor has met the first requirement that the Debtor redeem the collateral from the Richland County, South Carolina taxing authority by October 1, 2011.  The Debtor will have until March 15, 2012 to pay $1 million or have a ready, willing and able purchaser of property that will net Plantation Federal that amount of money.  If the Debtor meets this first milestone, the Debtor will then have until September 15, 2012 to sell or have ready and willing buyers of another $1,000,000 of property.  If the Debtor meets this second milestone, the Debtor will then have until March 15, 2013 to pay Plantation Federal in full or dispose of all of the remaining Plantation Federal collateral.  Interest will accrue against the Debtor's equity in the property.  The Debtor (through a third party) will pay and keep all property

9

taxes current during the 18-month period.

The Debtor has agreed execute a deed-in-lieu of foreclosure to be held in escrow by the attorney for Plantation Federal, which deed-in-lieu shall only be filed if the Debtor defaults on the Plantation Agreement and fails to cure such default within the applicable cure period set forth in the Plantation Agreement.

The terms in the Disclosure Statement and Plan are not intended to modify the terms of the Plantation Settlement but serve only to explain its terms. The terms of the October 12, 2011 Consent Order (Docket # 125 in this matter) attached as Exhibit B are incorporated herein as if fully set forth herein verbatim.

By operation of this Plan, Plantation Federal is granted replacement liens to the same extent and priority as Plantation Federal's security existed pre-petition.  Any sale will be subject to the liens of Plantation Federal up to the outstanding debt owed to Plantation Federal.

The Debtor believes that after the sale of all of Plantation Federal's collateral, a surplus of funds will be available.  All such excess funds shall be used to pay any unpaid claims of Classes 4, 5, and 6 in the order and priority shown hereinbelow.  However, in the unlikely event Plantation Federal's collateral does not fully repay Plantation Federal, any deficiency shall be treated as a Class 6 General Unsecured Claim.


Class 3          Secured Claim of First Palmetto          Secured, Impaired.

Pursuant to the First Palmetto Settlement, First Palmetto has agreed to allow the Debtor 10 months (beginning September 15, 2011) to market and sell the property in order to repay the debt and generate funds in excess of the outstanding obligations.  Debtor or its principal has agreed to employ a licensed real estate professional to market the property.  In exchange for the ten (10) month marketing period, the Debtor has agreed to make monthly adequate protection payments to First Palmetto in the amount of $5,000 with the first payment being due September 15, 2011.  The Debtor's principal, Kyle Tauch, is a guarantor under the First Palmetto debt and has specifically agreed that he will not be personally discharged of his obligations under such guaranty.

First Palmetto's Two Notch Road frontage property collateral is the subject of a condemnation suit by Richland County, South Carolina to convert part of the property into a school bus turn lane.  The Debtor has agreed as a part of the First Palmetto Settlement to consult with First Palmetto on the adequacy of any condemnation award and has agreed that either party may litigate the condemnation action at their own cost if such party believes the offered condemnation award to be inadequate.  Debtor has also agreed to resolve any access issues caused by the condemnation action or the loss of any of the Debtor's real properties as a result of the bankruptcy action in a manner reasonably satisfactory to First

10

Palmetto. Any funds received from the condemnation suit will be paid to First Palmetto, until First Palmetto is paid in full.

To ensure performance under the First Palmetto Agreement, the Debtor has agreed to give First Palmetto a deed-in-lieu of foreclosure to be held in escrow until the end of the 10-month marketing period only to be filed upon a default under the First Palmetto Agreement if such default is not cured prior to the expiration of a 15-day notice and cure period. The Debtor will provide First Palmetto with any offers to purchase the collateral and such offers shall be considered in good faith.

By operation of this Plan, First Palmetto is granted replacement liens to the same extent and priority as First Palmetto's security existed pre-petition.  Any sale will be subject to the liens of First Palmetto up to the outstanding debt owed to First Palmetto.

The terms in the Disclosure Statement and Plan are not intended to modify the terms of the First Palmetto Settlement but serve only to explain its terms.  The terms of the September 28, 2011 Consent Order (Docket # 120 in this matter) attached as Exhibit C is incorporated herein as if set forth herein verbatim.

The Debtor believes that equity exists in the property such that excess funds may be available after the sale of the First Palmetto collateral.  All such excess funds shall be used to pay any unpaid claims of Classes 4, 5, and 6 in the order and priority shown hereinbelow. The Debtor believes that First Palmetto is fully secured, but in the unlikely event First Palmetto's collateral does not fully repay First Palmetto, any deficiency shall be treated as a Class 6 General Unsecured Claim.

Class 4          Administrative Claims.  Unimpaired.

This Class consists of all Administrative Claims.  It is anticipated that this Class will solely consist of Administrative Claims of the Debtor's attorneys and other professionals of the Estate, as well as any and all quarterly fees of the United States Trustee.

The principal of the Debtor, Kyle Tauch has agreed to pay any post-petition expenses that are not related to the operation of the Greenhill Parish Apartments, including the United States Trustee's fees and the Debtor's attorney's fees, adequate protection payments to First Palmetto, and taxes related to the First Palmetto and Plantation Federal properties.

All administrative claims will be paid in full on the Effective Date of the Plan or at such later date as may be agreed upon between the Debtor and the Debtor's Administrative Claimants.  Payments to Claimants in this Class will only be made after Court approval, where such approval is required.

Class 5          Priority Claims. Priority, Unimpaired

Each holder of a Class 5 Claim that is an Allowed Priority Claim shall be paid in cash in an

amount equal to such Allowed Priority Claim, after the Debtor has finalized any and all Priority Claim objections.  The Debtor believes that there are no Class 5 claims.  To the extent it is determined that there are any *de minimis* class 5 claims, those claims will be paid from the proceeds derived from the sale of the above-mentioned collateral.

Class 6          General Unsecured Creditors.             Unsecured Non-priority, Impaired.

This Class consists of any and all Unsecured Creditors of the Debtor's Estate and any unsecured deficiency claims of the creditors in Classes 1-3 above. No payment to the unsecured creditors will be made until such time as the Debtor has sold assets to generate funds in excess of the Secured Claims, the Administrative Claims, and the Priority Unsecured Claims in Classes 1-5.  Such funds will only be paid pro *rata* after the Debtor has finished its Claims objections, but distributions to Class 6 creditors will only be made after the payment of any and all Claims in Class 5 as set forth hereinabove.  The Debtor believes significant equity exists in the properties that would allow it to make a distribution to the Unsecured Creditors in Class 6.

Class 7          Equity.            Equity Interest non-priority, Impaired.

Class 7 is comprised of the Equity Interests of Kyle Tauch, whose Equity Interests and any Claims he may hold shall be treated as subordinate to all other Claims against the Estate.  Only after payment in full of Allowed Claims in all prior Classes (Classes 1-6), holders of Equity Interests shall receive a *pro rata* share of distributions based upon the Equity Interests held as of the date of Confirmation. As of the Effective Date, all Equity Interests shall be deemed only to represent the right to receive distributions hereunder, and holders of Equity Interests shall be enjoined from transferring such Equity Interests or from taking other action that may adversely impact the Estate, including the taking of a worthless stock deduction.

## ARTICLE III  FEASIBILITY OF PROPOSED PLAN OF LIQUIDATION

It is provided in 11 U.S.C. §1129(a)(11) that in order for a plan to be confirmed, it must be demonstrated that the plan is not likely to be followed by a liquidation or the need for further reorganization of the Debtor or any successor of the Debtor, unless the liquidation or reorganization is proposed in the plan.  The Debtor's Plan proposes a liquidation of part or all of the Estate and the Debtor asserts that this is the best recovery available for all parties involved.  The Debtor believes that a controlled liquidation of certain parcels of property through a focused and strategic marketing campaign will maximize the amount realized by the estate and that those amounts would be in excess of any funds

that would be realized by a liquidation. The Debtor's Plan is proposed as a liquidating Plan and as such would not be followed by a liquidation. The Debtor asserts that the Plan is feasible and in the best interest of the Debtor, its creditors, its equity holders, and other interested parties.

## ARTICLE IV ACCEPTANCE OR REJECTION OF PLAN

### 4.1 Voting Procedure

Parties wishing to vote on the Plan must carefully read and review the Plan. After reviewing the Plan, you or your legal representative have the right to fill out the attached Ballot form indicating your class and your desire to either accept or reject the Plan.

### 4.2 Voting Classes

Each Holder of a Claim in an Impaired Class of Claims and Equity Interests which is not otherwise deemed to accept the Plan, and each Holder of a Claim that has been temporarily allowed for voting purposes only pursuant to Bankruptcy Rule 3018(a), shall be entitled to vote to accept or reject the Plan to the extent and manner provided under the Bankruptcy Code, the Plan, and any related order of the Bankruptcy Court. In the event of any controversy as to whether any Class of Claims or Equity Interests is impaired under the Plan, the Bankruptcy Court shall, after notice and hearing, determine such controversy prior to the Confirmation Date.

### 4.3 Acceptance By Class of Claims

Acceptance of the Plan by any Impaired Class of Claims shall be determined in accordance with the Bankruptcy Code and any related order of the Bankruptcy Court. Under Section 1126 of the Bankruptcy Code, an Impaired Class is deemed to have accepted the Plan if the Plan has been accepted by creditors that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Claims of such Class. Claims from the Potential Claimants are deemed allowed in estimated amounts for voting purposes if a proof of claim was filed by the bar date.

Upon receiving the Notice of Plan Hearing, Disclosure Statement, Plan and Ballot, holders of Claims may vote on the Plan by completing the attached Ballot form and returning it to the address listed on the form. The Notice of Hearing specifies the time by which the ballots must be returned. A filed Ballot does not constitute, and shall not be deemed, a proof of Claim or Equity Interest or an assertion or admission of a Claim or Equity Interest, nor shall a Ballot constitute or be deemed to be an assertion or admission on what Class a particular Claim is in for purposes of distributions under the Plan.

Each creditor, equity holder and party-in-interest should review the Plan and the Disclosure Statement carefully, including any and all Exhibits to the Disclosure Statement, in their entirety and then

determine whether to accept or reject the Plan based upon independent judgment and evaluation.


## ARTICLE V MEANS OF EFFECTUATING PLAN

**5.1      Effectuating Plan**

The success of the Plan, and any significant recovery to the Creditors of the Estate, is dependent upon the successful completion of the development and sale of the parcels of property.  This process will take no longer than 2 years and as such the Debtor will administratively close the case after it has completed any preference actions and claims objections.

Federal Rule of Bankruptcy Procedure 3003(c)(3) requires the creation of a claims bar date, which serves to forever bar any creditors of the Estate from asserting a claim after such date.   The Debtor's Plan calls for the discharge of any Claims against the Estate that were not filed before the claims bar date. Parties who have not filed Proofs of Claim prior to the claims bar date shall be enjoined from proceeding against the Debtor's Estate.


**5.2      11 U.S.C. § 1129 (5)(A)(i)&(ii) Disclosure**

Kyle Tauch will serve as the managing member of the Debtor post-petition for purposes of effectuating this Plan.  Mr. Tauch is an equity holder of the Debtor who's Equity Interest shall not be paid until such time as all the claims in classes 1-6 are paid in full.  Mr. Tauch shall not be compensated by the Debtor for his effort to liquidate the assets of the Debtor.  Mr. Tauch has guaranteed the liabilities of the Debtor creating a vested interest in liquidating the Debtor's assets for the highest value possible.


**5.3      Conditions precedent to Confirmation**

1.      The Bankruptcy Court shall have signed, and the Clerk of the Bankruptcy Court shall have entered, an order granting approval of the Disclosure Statement and finding that it contains adequate information pursuant to Section 1125 of the Bankruptcy Code, and such order shall have become a Final Order.

2.      The Confirmation Order shall have been signed by the Bankruptcy Court and entered by the Clerk of the Bankruptcy Court.


**5.4      Implementation on the Effective Date**

The Plan shall not become effective and operative unless and until the Effective Date of the Plan occurs.  The Effective Date of the Plan is the third business day after the Order Confirming the Plan that is entered by the Court becomes a Final Confirmation Order (which occurs at least (14) days after the

Confirmation Date if no court of competent jurisdiction shall have entered an order staying such Confirmation Order pending appeal as set forth hereinabove under the definition of "Final Confirmation Order").

## ARTICLE VI STATUS OF THE DEBTOR AFTER CONFIRMATION

After the confirmation of the Plan, the Debtor is exonerated from any and all Claims not filed by a creditor or claimant of interest against the Debtor prior to the date set by this Court (August 31, 2011).  The Debtor retains the right to move to value or to object to Claims subsequent to confirmation.

Any defaults whatsoever, with respect to any such indebtedness or obligations, or in the terms and conditions thereof, which are or may be based on events, facts or occurrences taking place on or before the date of Confirmation, lapse of time, or both, would take place or be deemed to take place on or before such date and shall be deemed to have been waived and shall not thereafter be a basis for the exercise by any person for any right or remedy whatsoever, as a creditor or claimant against the Debtor.

## ARTICLE VII EXECUTORY CONTRACTS

The Debtor will assume all executory contracts as they may relate to the rental of its Apartment Complex units.  Further, the Debtor will assume the Management Agreement dated August 1, 2006 between the Debtor and the management company GREP Atlantic, L.P.  Any other Executory Contracts that are not assumed herein above are deemed rejected.

## ARTICLE VIII JURISDICTION

**8.1      Retention of Jurisdiction.**

The Court shall retain jurisdiction over the Debtor, its property, and all other parties appearing in the Case as provided by the Plan or by Order of the Court.  The Court shall explicitly retain jurisdiction to enforce the terms of the Plan.  The Court shall further retain jurisdiction as provided in the Bankruptcy Code until entry of the final decree closing the Case.   To the extent that it may be necessary, Debtor may request that the Court enter a final order closing the Case but retaining jurisdiction for a limited purpose, including, but not limited to, presiding over any adversary proceeding, valuation hearing, claim objection or other matter that may be pending at the time of the closing of Case.

**8.2      Prosecution and Defense of Claims.**

The Debtor shall retain full power after Substantial Consummation to prosecute and defend any causes of action or proceedings existing at Substantial Consummation by or against it, or resulting from the administration of the Estate of the Debtor, or resulting from any other claim by or against the debtor

or its assets, or arising prior to or existing before Substantial Consummation.

## ARTICLE IX POST-CONFIRMATION ACTS

1.      The Debtor, and its agents, shall perform all acts necessary to complete and consummate the Plan, to include:

   a.  Prosecution of all claims against third parties by the Debtor and claims objections filed by the Debtor;

   b.  Execution and filing of all legal documents required; and

   c.  Performing any and all functions required by the United States Bankruptcy Code.

2.      The Debtor shall cause to be filed with the Court an itemized list of all receipts of, and disbursements by, the Debtor after confirmation.  Such report must be approved by the Court before the final decree is issued, discharging the Debtor in this Case.

## ARTICLE X "CRAM DOWN" FOR IMPAIRED CREDITORS NOT ACCEPTING THE PLAN

With respect to any class of creditors impaired, but not accepting the Plan by the requisite majority in number, and two-thirds in amount, the proponent of the Plan requests that the Court find that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or Equity Interests that are impaired under the Plan, and that the Court confirm the Plan without such acceptances by the said Impaired Classes.

## ARTICLE XI RELEASE AND EXCULPATION OF DEBTOR AND CO-DEFENDANTS

**11.1    Discharge of the Debtor**

The entry of an Order Confirming Plan acts as a discharge of any and all liabilities of the Debtor that are dischargeable under Section 1141 of the Bankruptcy Code, and shall discharge and release the Debtor, its property, officers, directors, employees, agents, attorneys, and stockholders, from all Claims and liabilities, including rights of setoff and recoupment, arising out of or in connection with the Debtor or its operations, and shall constitute an injunction against the pursuit of any such discharged Claims and liabilities except as set forth herein.  The rights afforded under the Plan shall be in exchange for and in complete satisfaction, discharge, and release, of all Claims and liabilities, unless otherwise set for the in the Plan.

16

RESPECTFULLY SUBMITTED on this the 3rd day of November, 2011, at Columbia, South Carolina.

McCARTHY LAW FIRM, LLC

By: /s/Daniel J. Reynolds, Jr.
G. William McCarthy, Jr., I.D.#2762
Daniel J. Reynolds, Jr., I.D. #9232
Sean P. Markham, I.D., #10145
*Attorneys for the Debtor*
1517 Laurel Street (29201)
Post Office Box 11332
Columbia, South Carolina 29211
Tele:  (803) 771-8836

# EXHIBIT  A

# (RBC Settlement Agreement)

## SETTLEMENT AGREEMENT AND RELEASE

THIS SETTLEMENT AGREEMENT AND RELEASE ("Settlement Agreement" or this "Agreement") is entered into as of this 3rd day of November, 2011 ("Effective Date"), by and between KT Spears Creek, LLC ("Debtor"), Kyle Tauch ("Guarantor"), and RBC Bank (USA) f/k/a RBC Centura Bank ("RBC" or the "Bank")    (The Debtor, Guarantor and the Bank will sometimes hereinafter be collectively referred to as the "Parties" or individually as the "Party").

## RECITALS

WHEREAS, on May 25, 2006, for good and valuable consideration, the Debtor executed and delivered to RBC a promissory note in the original principal amount of $19,700,000 (the "RBC Bank Note").  The RBC Bank Note was modified on May 25, 2006 by the execution of a Modification, Cross-Collateralization and Cross-Default Agreement and by the execution of a Change in Terms Agreement on May 23, 2008.

WHEREAS, to secure the RBC Bank Note and the debt evidenced thereby, the Debtor executed in favor of RBC Bank a Mortgage, Assignment of Rents and Security Agreement dated as of May 26, 2006 covering Phase I and the undeveloped Phase II of the Greenhill Parish Apartment Complex (the "Greenhill Apartments") owned by the Debtor.

WHEREAS, the Debtor also executed a separate Assignment of Leases, Rents, and Profits dated May 25, 2006 ("Assignment of Rents") giving RBC Bank a first priority security interest in the rents generated from the Greenhill Apartments, which Assignment of Rents was recorded in the Office of the Register of Deeds for Richland County, South Carolina in Book 1195 at page 2187.

WHEREAS, Kyle Tauch ("Guarantor") executed an unconditional Guaranty of payment dated May 25, 2006 further secure payment of the RBC Bank Note.

WHEREAS, RBC filed a lawsuit against the Debtor and Guarantor in the Court of Common Pleas for Richland County, South Carolina (the "Court of Common Pleas") styled and numbered *RBC Bank (USA) v. KT Spears Creek, LLC et al.*, Case No. 2010-CP-40-6025, which sought to foreclose its mortgage and security interest and obtain a deficiency judgment.  On November 12, 2010, the Court of Common Pleas entered an order appointing Henry W. Moore of Colliers International as receiver over the Greenhill Apartments, and on or about February 18, 2011, the Court of Common Pleas entered a Master's Order and Judgment of Foreclosure and Sale (the "Foreclosure Judgment").

WHEREAS, on May 3, 2011 (the "Petition Date"), the Debtor filed a voluntary Chapter 11 Petition in the United States Bankruptcy Court for the Southern District of Texas.  On July 5, 2011, the Bankruptcy Court for the Southern District of Texas transferred venue in the case from the Southern District of Texas to the United States Bankruptcy Court for the District of South Carolina (the "Bankruptcy Court").  The Chapter 11 Case is currently pending in the District of South Carolina as Chapter 11 Case No. 11-04241-jw (the "Bankruptcy").

WHEREAS, in the Bankruptcy, RBC filed a Motion for Relief from the Automatic Stay (the "RBC 362 Motion") and a Motion to Dismiss the Bankruptcy Case (the "RBC Motion to Dismiss") as an alleged bad faith filing. The Debtor has objected to both the RBC 362 Motion and the RBC Motion to Dismiss. The RBC 362 Motion and the RBC Motion to Dismiss have not yet been heard by the Bankruptcy Court, but the matters are still pending.

WHEREAS, the Debtor filed its Disclosure Statement and Plan of Reorganization in the Bankruptcy on or about September 5, 2011. On or about October 13, 2011, RBC filed its Objection to the Debtor's Proposed Disclosure Statement and Debtor's Proposed Plan of Reorganization (the "RBC Objection to Disclosure Statement and Plan"). A hearing on the Debtor's Disclosure Statement has been set for October 25, 2011 and the RBC Objection to the Disclosure Statement and Plan is still pending before the Bankruptcy Court.

WHEREAS, at the Petition Date there remained outstanding and owing to RBC from the Debtor pursuant to the RBC Bank Note, the total outstanding amount of $22,516,541.16, plus fees set forth below, which was comprised of a principal balance of $20,020,712.28 and accrued interest and fees of $2,495,828.88, plus actual attorneys fees and expenses through the date of bankruptcy filing in the amount of $60,924.44, for a total outstanding amount of $22,577,465.60.

WHEREAS, the Parties now wish to settle all of their disputes relating to the RBC Bank Note as set forth hereinbelow.

NOW, THEREFORE, in consideration of the mutual promises contained herein, and for other valuable consideration, the receipt and sufficiency of which the Parties hereby acknowledge, and intending to be legally bound, the Parties agree as follows:

1.    **Terms of Settlement**: By way of this Settlement Agreement, the Parties wish to and agree to settle this matter upon the following terms:

(i)    Except as otherwise provided herein, RBC will allow the Debtor to retain title to and possession of Phases I and II of the Greenhill Apartments for a period of twelve (12) months from execution of this agreement (the "Settlement Period");

(ii)    At the expiration of the Settlement Period, if the Greenhill Apartments have not sold or the Debtor has been unable to refinance the indebtedness in full, then RBC Bank shall be free to pursue its remedies, with the limitations set forth herein;

(iii)    During the Settlement Period, the Debtor must hire a real estate professional and publicly market Phases I and II of the Greenhill Apartments for sale;

(iv)    RBC will have the right to approve the choice of the agent/broker to be employed for marketing the sale of Phases I and II of the Greenhill Apartments and to approve the amount of sales/brokerage commissions;

(v)    Debtor agrees to provide RBC Bank with copies of all offers it receives and to provide or cause its broker to provide monthly reports regarding the marketing activities for the Green Hill Apartments;

(vi)    The Parties agree to negotiate in good faith regarding any offer to purchase Phase I and/or Phase II of the Greenhill Apartments, which shall specifically, but not be limited to, require that RBC may not withhold its consent to any valid, viable purchase offer that would result in a lower deficiency than the deficiency cap described hereinbelow, and that the Debtor may not withhold its consent or agreement to any sale that would result in payment or satisfaction in full of the amounts remaining due under RBC Bank Note;

(vii)    The RBC Bank Note shall be hereby modified to accrue interest at the reduced interest rate of 5% per annum from the date of the execution of this agreement;

(viii)    The Debtor shall retain the current property management company, Greystar, and shall not change property management companies without the express written consent of RBC;

(ix)    The Debtor agrees that the occupancy rate of the Greenhill Apartments will not fall below 75%;

(x)    RBC shall be entitled to and shall receive all of the Net Operating Income of the Greenhill Apartments, which proceeds shall be applied to the RBC Bank Notes;

(xi)    The Debtor shall not receive any monies from the operation of the Greenhill Apartments;

(xii)    RBC shall allow the Debtor to use RBC Bank's cash collateral for payment of operating costs.  RBC Bank agrees that it will pay the future property taxes, and insurance from the net operating income it has received from the property.  Any payment of property taxes or insurance by RBC shall be added to the principal RBC Bank Note balance as a protective advance.  Similarly, any and all post-petition payments by the Debtor to RBC Bank or sweeps of the Debtor's accounts by RBC Bank shall be applied to the RBC Bank Note balance;

(xiii)    Upon notification from RBC to the Debtor and Guarantor of any material default under the terms of this Settlement Agreement, the Debtor and Guarantor shall have twenty (10) days to cure any such material defaults;

(xiv)    In the event the default is not cured, the stay shall automatically terminate and RBC  will be free to pursue its remedies;

(xv)    The Debtor will execute a deed in lieu to be held in escrow by counsel for RBC to be filed only upon a material default of this Settlement Agreement and only after the expiration of any cure period set forth herein;

(xvi)    In addition, upon a material default of this Settlement Agreement and only after the expiration of any cure period set forth herein, if RBC Bank chooses to complete its pending foreclosure, the Debtor agrees not to contest or interfere with the completion of the foreclosure;

(xvii)    RBC agrees that it will cap the amount of any deficiency claim remaining after the sale or liquidation of the Greenhill Apartments property (whether the property is sold during the Settlement Period or whether the property is transferred to RBC pursuant to deed in lieu of foreclosure or whether RBC completes its pending foreclosure) at an amount not to exceed $1,500,000 in aggregate against the Debtor and the Guarantor;

(xviii)    Upon execution of this Settlement Agreement, the Debtor will promptly amend its Disclosure Statement and Plan of Reorganization in the Bankruptcy to incorporate the terms of this Settlement Agreement, and RBC shall promptly thereafter dismiss or withdraw with prejudice the RBC 362 Motion, the RBC Motion to Dismiss, and the RBC Objection to Disclosure Statement and Plan and shall support a Plan of Reorganization that incorporates the terms of this Settlement Agreement.

2.    **Court Approval:**  This Agreement is contingent upon successful confirmation by the Bankruptcy Court in this matter of a Plan of Reorganization incorporating the terms of this Settlement Agreement.

3.    **Release – Debtor/Guarantor to RBC:** In consideration for the foregoing, the Debtor and the Guarantor, their successors, heirs, assigns, shareholders, members, directors, agents, officers, insurers, predecessors, affiliates, and subsidiaries, and each of them, jointly and individually (collectively "Debtor/Guarantor"), release and forever discharge RBC, its employees, agents, successors, heirs, assigns, shareholders, members, directors, officers, insurers, predecessors, affiliates, parents and subsidiaries, and each of them (collectively "RBC") from any and all claims, including any and all past, present, or future claims, contingent claims, counterclaims, third-party claims, liabilities, demands, lawsuits, judgments, actions, suits at law or in equity, causes of action, accountings, rights, obligations, covenants, contracts, insurance policies, agreements, damages, punitive damages, costs, fees, attorneys' fees, interests, and any liability of any kind or nature whatsoever, direct or derivative, known or unknown, choate or inchoate, that the Debtor/Guarantor had, now have, may have at any time in the future, or claim to have had, against RBC arising from or related to any and all matters, dealings, occurrences, duties, actions, failures to act, omissions, events, obligations, covenants, contracts, agreements, sales, warranties, representations, documents, transactions, and instruments, including without limitation, any claim, any debt, property, or dispute described herein.  Specifically released are any claim(s) the Debtor/Guarantor assert or purport to assert as to the validity of the RBC Bank Note and any of the documents related thereto, specifically including the Mortgage and any Assignment of Rents relating to the Greenhill Apartments property (as herein defined), from the beginning of time through and including the date of this Agreement.

**4.  Release-RBC:** Except for the obligations set forth herein and in the Debtor's Plan of Reorganization, and in consideration of the foregoing, RBC does hereby release, acquit, and forever discharge the Debtor and Guarantor, their successors, heirs, assigns, shareholders, members, directors, agents, officers, insurers, predecessors, affiliates, and subsidiaries, and each of them, jointly and individually (collectively "Debtor/Guarantor") from any and all claims that RBC had, now has, may have at any time in the future, or claim to have had, against the Debtor/Guarantor arising from the RBC Bank Note, the Greenhill Apartments Mortgage, or the Greenhill Apartments property, provided however that this release is contingent upon the entry of a non-appealable order by the Bankruptcy Court approving the settlement contained herein or

confirming a Plan of Reorganization incorporating the terms of this Settlement and Release Agreement, and the performance by the Debtor/Guarantor of the obligations hereunder. Additionally, RBC expressly states, and Debtor/Guarantor acknowledge, that this release is limited to the matters described herein, and does not include any other transactions or dealings of the Debtor/Guarantor with RBC, if any.

5.  **Good Faith:**  The Parties hereunder state and agree that this Agreement was and is the product of good faith negotiations between the Parties hereto.  The Debtor and the Guarantor understand, acknowledge, and agree that RBC has extended good and valuable consideration to the Debtor and the Guarantor, and each of them, by way of the waiver and/or enforcement of its various rights, among other consideration, and is thereby entitled to reasonably rely on this and other provisions contained herein.  RBC understands, acknowledges, and agrees that the Debtor and the Guarantor have extended good and valuable consideration to RBC, and the Debtor and the Guarantor, by way of the waiver and/or of enforcement of their various rights, among other consideration, are thereby entitled to reasonably rely on this and other provisions contained herein.

6.  **Tax Consequences:**  The Bank, the Partnership, and the Debtor acknowledge and admit that none of them has made any promise or representation concerning the tax consequences of this Agreement.  It is agreed that each of the Parties are solely and completely responsible for any income tax, estate tax, or other tax payments that might later be contended, found or held to be applicable to any actions taken pursuant to this Agreement.

7.  **Indemnification:**  Any Party, unconditionally and on demand, shall indemnify fully and shall hold and save harmless any other Party from and against any and all claims, liabilities, losses, damages, punitive damages, fees, costs, and expenses, including attorneys' fees, as necessitated by reason of any breach of this Agreement.  This Agreement shall be deemed breached and a cause of action accrued on such breach immediately upon the commencement or continuation of or participation as a party in any action before any court or regulatory or other body contrary to this Agreement by any Party, and this Agreement may be pleaded as a complete defense and bar to any action taken in contravention of this Agreement.

8.  **Representation as to Ownership and Authority:** The Parties warrant and represent that they have not sold, assigned, granted, or transferred to any other person, corporate or natural, any claims encompassed by this Agreement that the Party has, had, may have at any time in the future, or claim to have or have had, or could have had, against any of the other Parties.

9.  **Representation by Counsel:**  The Parties acknowledge that they have been represented by competent counsel throughout all the negotiations that preceded the execution of this Agreement, that they had a full opportunity to negotiate this Agreement, and that they have negotiated and executed this Agreement with the consent and upon the advice of such independent legal counsel.  The Parties further acknowledge that they have read this Agreement, assent to all the terms and conditions contained herein without any reservation whatsoever and that they have had the same explained to each of them by their own respective counsel, who has answered any questions which were asked with regard to the meaning of any provision of this Agreement.

10.  **Specific Enforcement:**  If any Party fails to comply with any provision of this Agreement that is applicable to such Party, the other Party may demand specific performances of this Agreement and may exercise any other remedy available at law or equity.

11.  **Entire Agreement; Amendments:**  This Agreement expresses the entire understanding and agreement of the parties hereto with respect to the subject matter hereof and thereof and supersedes all prior understandings and agreements of the parties regarding the same subject matter. This Agreement may not be amended or modified except by a writing signed by the parties hereto.

12.  **Severability:**  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, each provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

13.  **Undiscovered Facts:**  The parties, and each of them, affirmatively state, acknowledge, and agree that they may hereafter discover facts different from or in addition to those now known or believed to be true regarding the subject matter of this Agreement and agree that this Agreement shall remain in full force and effect notwithstanding the existence or discovery of any such different or additional facts.

14.  **Construction:**  This Agreement shall not be construed more strongly against either Party solely by reason of who was more responsible for its preparation.

15.  **Counterparts:**  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. Electronic and facsimile copies of this Agreement and the signatures hereto may be used with the same force and effect as the original.  This Agreement shall be deemed fully executed and effective when all Parties have executed at least one of the counterparts, even though no single counterpart bears all such signatures.

16.  **Authority:**   The party executing this Agreement on behalf of the Debtor and Guarantor warrant and represent that, upon Bankruptcy Court approval of this Agreement, he/she has the authority to bind the respective Debtor and Guarantor, grant the releases set forth herein, and to perform all acts required to be done hereunder.

17.  **Section Titles:**  The section titles contained in this Agreement are and shall be deemed to be without substantive meaning or content of any kind whatsoever and are not a part of the Agreement between the parties hereto.

18.  **Governing Law:** This Agreement shall be governed by the laws of the State of South Carolina.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the day and year first stated above.

Party

_____

Witness

_____(SEAL)

Witness

Kyle Tauch, Guarantor


KT SPEARS CREEK, LLC

_____

Witness

By:_____

_____

Its:_____

Witness


RBC BANK (USA)

By: _____

Witness

Its: _____

Witness

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the day and year first stated above.

Party

_____ (SEAL)
Kyle Tauch, Guarantor

_____
Witness

_____
Witness

KT SPEARS CREEK, LLC

By: _____

Its: _____ Manager

_____
Witness

_____
Witness

RBC BANK (USA)

By: _____

Its: _____

_____
Witness

_____
Witness

# EXHIBIT  B

## (Plantation Federal October 12, 2011 Consent Order)

## U.S. BANKRUPTCY COURT
### District of South Carolina

Case Number: **11-04241-jw**

### Consent Order

The relief set forth on the following pages, for a total of 4 pages including this page, is hereby ORDERED.

---

**FILED BY THE COURT**
**10/12/2011**



_John E Waites_

Chief US Bankruptcy Judge
District of South Carolina

Entered: 10/13/2011

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

IN RE:

KT Spears Creek, LLC,

                              Debtor.

C/A No. 11-04241-jw

Chapter 11

**CONSENT ORDER**

THIS MATTER is before the Court upon the agreement and consent of KT Spears Creek, LLC ("the Debtor") and Plantation Federal Bank, successor to First Savers Bank (hereafter "the Bank"). The Debtor and the Bank hereby agree to and stipulate the following:

### BACKGROUND

1. The Debtor is the owner of unimproved real property (hereafter "the collateral") with the following legal description:

> All that certain piece, parcel, or tract of land, with any improvements thereon, situate, lying and being near Columbia, in the County of Richland, State of South Carolina, containing 65.94 acres and being more particularly shown and delineated on a plat prepared for KT Spears Creek, LLC, prepared by United Design Services, Inc., dated August 13, 2007, and recorded in the Office of the Register of Deeds for Richland County, South Carolina, in Plat Book 1366, at page 3582. Reference is hereby craved to said plat for a more complete and accurate metes and bounds description of said 65.94 acres.

> Derivation: Deed from DAK I, LLC, to K.T. Spears Creek, LLC, dated December 3, 2004, and recorded December 6, 2004, in the Office of the Register of Deeds for Richland County in Record Book 1003, at page 1581. TMS NO.: 25800-03-40 (portion.)

2. The Bank is a secured creditor of the Debtor by virtue of that certain Promissory Note dated on or about December 21, 2007, (hereafter "the Note") between the Debtor and First Savers Bank in the original principal amount of $6,000,000, with interest at a fixed rate of 7%, thereafter renewed on January 26, 2010, in the principal amount of $5,950,000. The renewal is evidenced by a Promissory Note dated January 26, 2010, which was executed and delivered to the Plantation Federal Bank in the amount of $5,950,000 (hereafter "the Renewal Note"), and that certain mortgage ("Mortgage") recorded on December 27, 2007, at 12:34 p.m. in the records of Richland County, South Carolina, in Book 1387 at page 1944. The Debtor and the Bank agree that the Mortgage is a valid first priority lien on undeveloped real property located in South Carolina.

***TERMS***

3.  By October 1, 2011, the Debtor will redeem the collateral from the appropriate Richland County, South Carolina, taxing authority.

4.  On March 15, 2012, the Debtor will pay the Bank $1 million or have ready, willing, and able buyer(s) for portions of the collateral in that amount.

5.  On September 15, 2012, the Debtor will pay the Bank $1 million or have ready, willing, and able buyer(s) for portions of the collateral in that amount.

6.  By March 15, 2013, all the collateral will have been sold and the Bank paid in full.

7.  The Debtor will be entitled to a fifteen (15) day notice and cure period in the event of a default in payment of adequate protection to the Bank.

8.  The Debtor will keep the property taxes current on the collateral.

9.  The Debtor will execute all of the necessary documentation for a deed-in-lieu of foreclosure ("Deed-in-Lieu"), and the Debtor agrees not to impede the Bank's efforts to realize upon its collateral.

10. The Bank will hold the Deed-in-Lieu and all related documentation until September 15, 2013, the collateral has been fully liquidated and the Bank paid in full, or this agreement has been breached by the Debtor, whichever comes first.  In the event of a default hereunder, the Bank may record the Deed-in-Lieu or proceed with foreclosure in its sole discretion.  No further action will be required before the bankruptcy Court.

11. Nothing herein shall be interpreted as a waiver of the Bank's right to enforce the provisions of loan documents, including but not limited to the guaranty.

12. The Bank agrees to withdraw its 362 filed against the Debtor.

13. Any default of this agreement described in this consent order, either by failure to pay or otherwise, will result in an immediate lifting of the stay without further notice.

Based upon the foregoing and with the consent of the Debtor and the Bank, it is hereby:

**ORDERED, ADJUDGED, AND DECREED** that that the settlement described above is approved by the Court.

**AND IT IS SO ORDERED.**

CONSENT PAGE FOLLOWS:

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

IN RE:

C/A No. 11-04241-jw

KT Spears Creek, LLC,

Chapter 11

Debtor.

**CONSENT ORDER**

**WE SO AGREE AND CONSENT:**

/s/Sean P. Markham
G. William McCarthy, Jr.,(F.I.D.#2762)
Daniel J. Reynolds, Jr., (F.I.D. #9232)
Sean P. Markham, I.D., (F.I.D. #10145)
McCARTHY LAW FIRM, LLC
*Attorneys for the Debtor*
1517 Laurel Street (29201)
Post Office Box 11332
Columbia, South Carolina 29211
Tele:  (803) 771-8836


/s/ Michael J. Polk
Clinch H. Belser, Jr. (F.I.D. # 1292)
Michael J. Polk (F.I.D. # 6528)
**BELSER & BELSER, P.A.**
1901 Main St., Suite 1550 (29201
P.O. Box 96
Columbia, South Carolina 29202
(803) 929-0096
*Attorneys for Plantation Federal Bank and First Savers Bank*

**EXHIBIT  C**

**(First Palmetto September 28, 2011 Consent Order)**

## U.S. BANKRUPTCY COURT
### District of South Carolina

Case Number:  **11-04241-jw**

### Consent Order

The relief set forth on the following pages, for a total of 6 pages including this page, is
hereby ORDERED.

**FILED BY THE COURT**
**09/28/2011**



_John E Waites_

Chief US Bankruptcy Judge
District of South Carolina

Entered: 09/28/2011

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

IN RE:

KT Spears Creek, LLC,

Debtor.

C/A No. 11-04241-jw

Chapter 11

**CONSENT ORDER**

THIS MATTER is before the Court upon the agreement and consent of KT Spears Creek, LLC ("Debtor") and First Palmetto Savings Bank ("FPSB").  Debtor and FPSB hereby agree to and stipulate the following:

### *BACKGROUND*

1.  Debtor is the owner of unimproved real property with the following legal descriptions:

> ALL that certain piece, parcel or tract of land, with improvements thereon, fronting on U.S. Highway No. 1 (50 foot right-of-way) and Old National Highway (Rd. S-28-2127 – a 66 foot right-of-way) and located near Pontiac, County of Richland, State of South Carolina containing 6.28 acres, more or less, and shown on boundary survey prepared for K.T. Spears Creek LLC, prepared by Daniel Riddick & Associates, Daniel D. Riddick, P.S. No. 33228, dated July 12, 2005 and recorded July 27, 2005 in the Office of the Register of Deeds for Richland County in Record Book 1079, at page 572, and having the following metes and bounds to wit: BEGINNING at a point located at the intersection of U.S. Highway No 1 and Old National Highway and running in a southeasterly direction along Old National Highway S 50°27'26" a distance of 426.96 feet to a point; thence turning and running in a southwesterly direction S81°04'18"W a distance of 242.18 feet to a point thence S78°40'38"W a distance of 268.21 feet to a point thence turning and running in a northeasterly direction N74°48'34"E a distance of 783.43 feet to the point and place of Beginning.

> DERIVATION: An undivided one-half interest to Virginia R. Monroe from G.P. Monroe, Jr. by deed dated December 29, 1997 and recorded December 30, 1997 in the Office of the Register of Deeds for Richland County in Deed Book 1425, at page 688; and Deed to G.P. Monroe, Jr. from J.L. Rogers dated April 26, 1960 and recorded April 28, 1960 in the

Office of the Clerk of Court (n/k/a Register of Deeds) for Richland County in Volume 273, at page 374.

TMS No.: Portion of 25900-04-04

ALL that certain piece, parcel or lot of land, with any improvements thereon, situate, lying and being in the County of Richland, State of South Carolina, and delineated as Tract Four (4), containing 1.08 acres, on a plat prepared for Joe Hudson by E.F. Owens, Reg. Land Surveyor, dated August 9, 1972 and recorded August 27, 1973 in the Office of the Register of Deeds for Richland County, South Carolina in Plat Book 43, at page 812. Reference is hereby craved to said recorded plat for a more complete and accurate metes and bounds description of said 1.08 acres.

DERIVATION: Quitclaim Deed of Dorothy W. Hudson from Joe Q. Hudson dated September 14, 1999 and recorded September 28, 1999 in the Office of the Register of Deeds for Richland County, South Carolina in Record Book 348, at page 1216.

TMS No.: 25800-03-04

Hereinafter, these parcels of real property shall be collectively described as the "Two Notch Frontage."

2.   FPSB is a secured creditor of the Debtor by virtue of that certain promissory note dated June 22, 2010 in the principal amount of eight hundred eighty-five thousand seven hundred nineteen and 46/100s dollars ($885,719.46) with interest at a rate of six and 00/100ths (6.00%) percent per annum and that certain mortgage ("Mortgage") dated March 16, 2009 and recorded in the Office of the Register of Deeds for Richland County, South Carolina. The Debtor and FPSB agree that the Mortgage is a valid first priority lien on undeveloped real property located in South Carolina.

### *DISCUSSION*

3.   Beginning September 15, 2011, Debtor will begin making monthly adequate protection payments to FPSB in the amount of $5,000.00.

4.   Debtor will be entitled to a fifteen (15) day notice and cure period in the event of a default in payment of adequate protection to FPSB.

5.   Debtor will keep the property taxes current on the Two Notch Frontage.

6.   The Debtor and FPSB agree to a ten (10) month marketing and sale period, during which the Debtor will market and attempt to sell the Two Notch Frontage through a licensed real estate professional.  Such real estate professional shall be retained by the Debtor or its principal and such real estate principal will utilize the best efforts of a real estate professional in the commercial real estate field to market and procure a buyer who is ready, willing and able to purchase the Two Notch Frontage.  The ten (10) month period shall start from the date of the first monthly payment on September 15, 2011.

7.   The Debtor will execute all of the necessary documentation for a deed-in-lieu of foreclosure ("Deed-in-Lieu"), and the Debtor agrees not to impede FPSB's efforts to realize upon its collateral.

8.   FPSB will hold the Deed-in-Lieu and all related documentation until such time as ten (10) months has expired or this agreement has been breached by the Debtor, whichever comes first.  In the event of a default hereunder, FPSB may record the Deed-in-Lieu or proceed with foreclosure in its sole discretion.

9.   Nothing herein shall be interpreted as a waiver of FPSB's right to enforce the provisions of loan documents, including but not limited to the guaranty.  Further, the guarantor acknowledges that he will not be personally discharged of his obligations under the guaranty.

10. Debtor and FPSB shall review and determine if the Condemnation Award proposed in that certain civil action entitled Richland County School District 2, v. KT

Spears Creek, LLC et. al., Case No.: 2011-CP-40-2375 ("Condemnation Action") is fair and equitable.

11. To the extent that either Debtor or FPSB determine that the Condemnation Award is not fair and equitable, such party may choose to litigate the Condemnation Action and seek an increase in the award, but the party that does act is responsible for its own attorney's fees and costs, which shall not be deducted from the Condemnation Award.  If the acting party is awarded attorney's fees and/or costs under S.C. Code Ann. § 28-2-510, any such award thereunder shall be applied to pay any fees and costs incurred by that party in the Condemnation Action.  It is specifically understood that any Condemnation Award in connection with the Condemnation Action shall be paid to FPSB.

12. Regardless of the result of the Condemnation Action, Debtor will resolve any access issues related to the Two Notch Frontage now existing or that may be created by either the Condemnation Action or any other loss of any of the real properties which are the subject of this bankruptcy action in a manner satisfactory to FPSB.

13. FPSB agrees not to oppose Debtor's Motion for Final Authority to Use Cash Collateral and will further take no position in regards to said motion.

14. FPSB agrees to withdraw its Motion to Dismiss filed against Debtor.

15. Any default of this agreement described in this consent order, either by failure to pay or otherwise, will result in an immediate lifting of the stay without further notice.

Based upon the foregoing and with the consent of the Debtor First Palmetto Savings Bank it is hereby:

**ORDERED, ADJUDGED, AND DECREED** that that the settlement described above is approved by the Court.

**AND IT IS SO ORDERED.**


**WE SO AGREE AND CONSENT:**

/s/Sean P. Markham
G. William McCarthy, Jr., I.D.#2762
Daniel J. Reynolds, Jr., I.D. #9232
Sean P. Markham, I.D., #10145
McCARTHY LAW FIRM, LLC
*Attorneys for the Debtor*
1517 Laurel Street (29201)
Post Office Box 11332
Columbia, South Carolina 29211
Tele:  (803) 771-8836


/s/ Ian D. McVey
Ian D. McVey, Fed Id. No. 9394
P.O. Box 1390
Tel. (803) 404-6900
Fax. (803) 404-6901
Email: ianmcvey@callisontighe.com
Attorneys for First Palmetto Savings Bank, FSB